**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **BRYANT GUARTOS,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:12-cv-0048** |
| | ) | |
| **RONALD COLSON, Warden, Riverbend** | ) | **Judge Sharp** |
| **Maximum Security Institution,** | ) | |
| | ) | |
| **Respondent.** | ) | |

<u>**MEMORANDUM OPINION**</u>

Petitioner Bryant Guartos was convicted and sentenced by the Criminal Court for Davidson County, Tennessee in Nashville after a jury trial in 2001, and is presently an inmate at Riverbend Maximum Security Institution, also in Nashville. Now before the Court is his *pro se* petition under 28 U.S.C. § 2254 for a writ of habeas corpus. For the reasons set forth herein, the Court finds that the petitioner is not entitled to relief.

**I.     BACKGROUND AND PROCEDURAL HISTORY**

On April 5, 2001, petitioner Bryant Guartos was convicted of first degree felony murder**,** especially aggravated robbery, aggravated robbery, and conspiracy to commit aggravated robbery by a jury in the Criminal Court for Davidson County, Tennessee, in connection with an armed robbery at the Green Hills Mall in Nashville. Guartos initially received an effective total sentence on all charges of life imprisonment plus forty-seven years. The trial court denied Guartos's motion for a new trial on November 24, 2003, after a hearing conducted on May 27, 2003. Guartos appealed the denial of his motion for a new trial, and was denied relief on direct appeal. *State v. Guartos*, No. M2003-03073-CCA-R3-CD, 2006 WL 163633 (Tenn. Ct. App. Jan. 26, 2006). The Tennessee Supreme Court denied review, but the United States Supreme Court granted certiorari and vacated the judgment in light of its decision in *Cunningham v. California*, 549 U.S. 270 (2007). *Guartos v. Tennessee*, 549 U.S. 1197 (2007). On remand, the Tennessee Court of Appeals determined that the trial court had applied enhancement factors that were not found by a jury beyond a reasonable doubt, in violation of Guartos's Sixth Amendment right to a jury trial. *State v. Guartos*, No. M2003-03073-CCA-R3-CD, 2007 WL 4245084 (Tenn. Ct. Crim. App. Dec 04,

2007). Because the trial court had failed to make specific factual findings regarding the state's proof of Guartos's prior criminal convictions, the court reversed the judgments for especially aggravated robbery, aggravated robbery, and conspiracy to commit aggravated robbery, and remanded for resentencing. On remand, the trial court resentenced Guartos to a total effective sentence of life plus forty-three years.

On August 8, 2008, Guartos filed a *pro se* petition for post-conviction relief in the state courts. Counsel was appointed and his petition was denied; the denial was affirmed on review by the Tennessee Court of Appeals. *Guartos v. State*, 2011 WL 2682184 (Tenn. Ct. Crim. App. July 8, 2011). Guartos's application for permission to appeal to the Tennessee Supreme Court was dismissed as untimely. (*See* ECF No. 1, at 23 (*Guartos v. Tennessee*, No. M2010-00801-SC-R11-PC (Tenn. 23, 2011), Order dismissing application).)

The instant petition for the writ of habeas corpus was filed in this Court on January 9, 2012. Shortly after the petition was filed and the petitioner submitted the $5.00 filing fee, the Court conducted a preliminary examination thereof and determined that it stated colorable claims for relief. Accordingly, the Court entered an order (ECF No. 11) directing the respondent to answer, plead or otherwise respond to the petition. Rule 4, Rules Gov'g § 2254 Cases.

The respondent submitted his answer (ECF No. 29), to which the petitioner has submitted a letter to the Court accompanying the filing of several documents (ECF No. 46), and reply (ECF No. 50, with attached documents at ECF No. 50-1). The documents submitted by the petitioner are largely duplicative of the state-court record already submitted by the respondent. The petitioner has also filed another motion for appointment of counsel (ECF No. 48), and the affidavit of David Raybin in which Mr. Raybin attests to his belief that the petitioner was denied the effective assistance of counsel.

Upon consideration of the petition, the answer, the reply, and the expanded record, it appears that an evidentiary hearing is not needed in this matter. *See Smith v. United States*, 348 F.3d 545, 550 (6th Cir. 2003) (an evidentiary hearing is not required when the record conclusively shows that the petitioner is not entitled to relief). Therefore, the Court shall dispose of the petition as the law and justice require. Rule 8(a), Rules Gov'g § 2254 Cases.

**II.     FINDINGS OF FACT**

     **A.     Evidence Presented at Trial**

The facts presented at trial were summarized by the Tennessee Court of Criminal Appeals as follows:[1]

> At the trial, the murder victim's mother testified that her son was forty-seven years old at the time of his death. She said that before working as a security guard, he had retired from the United States Army, where he had been a Green Beret. She said her son survived twenty-one days after the shooting.
>
> Kimberly Allison testified that on the day of the robbery, she was the store manager of Carlyle and Company, a jewelry store located in Green Hills Mall in Davidson County. She said that on March 16, 1999, her store had a special showing of seventy-five to one hundred Rolex watches. She said that Carlyle and Company had a special showing twice each year and that the special showing lasted only for one day. She said Carlyle and Company advertised the event in the newspaper.
>
> Ms. Allison said that on the day of the special showing, the murder victim and Gene Nagele were the security officers who transported the watches to Carlyle and Company. She said that after the close of business, the watches were secured in the store's vault until the morning when the security officers would return and retake possession of the watches. She said that on the morning of March 17, she arrived as usual, drove into the Green Hills Mall parking garage, parked her car, and saw the victim lying on the ground. She said Gene Nagele was next to the victim, helping him. She said the victim had been shot in the chest. Ms. Allison said that the value of the Rolex watches was between $700,000.00 and $750,000.00 and that the watches were never recovered.
>
> Gene Nagele testified that he worked for Corpus Securities International in March 1999. He said the company provided security for Carlyle and Company, escorting Rolex watches to and from shows. He said he was assigned to pick up the watches in Greensboro, North Carolina, take them to the location of the show, and then return the watches to Greensboro. He said the murder victim was his partner for the Carlyle and Company assignment. He said both he and the victim carried .45 caliber handguns.
>
> Mr. Nagele testified that on March 16, 1999, he and the victim arrived at the Carlyle and Company store at Green Hills Mall in their company car, a Jeep Cherokee, with the Rolex watches. He said he had the morning shift and the victim had the evening shift. He said that at the close of business, both he and the victim were present as the watches were secured in the store's vault. He said that on the morning of March 17, he and the victim arrived in the Green Hills Mall parking garage and parked on the second floor. He said they were parked between fifty and one hundred feet from the closest entrance to the Carlyle and Company store, which was on the second floor of the parking garage. He said that when they retrieved the watches, the victim was transporting the watches on a cart and he was behind the victim, providing security. He said that as they approached the Jeep Cherokee, he heard someone running behind him. He said that he turned to see who it was but that as he turned, he was struck in the back, heard a shot fired, fell down, and lost consciousness. He said that before he lost consciousness, he heard his assailants speaking but not in English. He said that although he caught a brief glimpse of his assailants, he could not identify them except to say that "they were not light skinned." He said that when he regained consciousness, he heard the victim calling his name,

---

[1] State appellate court findings of fact can constitute factual findings in a habeas action. *See, e.g.*, *Girts v. Yanai*, 501 F.3d 743, 749 (6th Cir. 2007); *see also* 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

saying he had been shot. He said he went to the victim's aid and noticed that his own gun and the watches were missing. He said he also noticed a woman trying to get her children out of a car. He said that he had noticed the woman before the robbery as he and the victim were leaving the mall and that she had just arrived with her two small children in car seats. On cross-examination, Mr. Nagele acknowledged that he was unable to identify the defendant as one of his assailants.

Deborah Sloan testified that on the morning of March 17, 1999, she was in the Green Hills Mall parking garage with her two children. She said she parked about two parking spaces away from the mall entrance. She said she had been parked for about thirty seconds when she saw the security guards leaving the mall. She said she was getting her children ready when she heard a bang behind her car. She said that she turned to see what had happened and that she thought the security guards had dropped one of the big boxes they were transporting. She said she quickly realized that was not what happened as she saw both security guards on the ground and three men running around. She said two of the men were picking up the boxes and the other one was picking up a gun. She said that the men who picked up the boxes ran away but that the other man remained behind to pick up the gun before fleeing. She said she saw all three men get into a fairly new, red or maroon minivan with tinted windows. She said she was not sure if the men knew she was there because she had stayed down. She said the men were in their late twenties, wore baggy clothing, and had dark hair and dark skin. She said it was difficult to tell if they were African-American or Hispanic but said the men were dark skinned. She said the men were not particularly tall or heavy. Ms. Sloan identified the defendant as the man who picked up the gun.

Ms. Sloan testified that Metropolitan Police Department Detective Norris Tarkington showed her a set of photographs in July 1999. She said she thought she was supposed to identify all of the assailants from the photograph array. She said, however, that she was only able to identify positively one man, the defendant. She said Detective Tarkington returned in October 2000 and showed her another set of photographs. She said she was able to identify two other people from this set of photographs as the other two men who committed the robbery. She said the second person she identified was Jonathan Londono and the third was Edwin Gomez. She said that of the three men she identified from the photographs, she was most certain about the defendant.

On cross-examination, Ms. Sloan said that she was certain that the defendant was one of the men involved in the robbery from the moment she saw the photograph array containing his picture. She admitted, however, making a statement to the police that the robbers were black men. On redirect-examination, Ms. Sloan said that in her statement where she described the assailants as black men, she put quotation marks around the words "black men." She said she did so only to indicate that they had dark skin and were not Caucasians. She said she told the detectives why she had put the quotations around the words "black men."

Christina Hudson testified that she worked in the Green Hills Mall in March 1999. She said that on the morning of March 17, 1999, she arrived at the mall and parked in the parking garage. She said she noticed a purple or dark maroon minivan parked behind her. She said a man approached and got into the van. She said she was able to see other men in the van. She said that the men were Hispanic but that she was unable to identify any of them to the police.

The deposition testimony of Dorothy Drake was read into the trial record because she was unable to attend the trial due to surgery. In her deposition, Ms. Drake said that she was at the Green Hills Mall on March 17, 1999. She said she parked in the parking garage. She said that when she entered the mall, she saw some young men standing near the entrance. She said that although she could not determine the men's ethnicity or race, "they were not American, our race." She said the men were young. She said she

was unable to identify the defendant as one of the men she saw at the mall entrance.

Metropolitan Police Department Officer Thales O. Finchum testified that he responded to a robbery call at Green Hills Mall on the morning of March 17, 1999. He said that when he arrived, he saw the victim lying on the ground, wearing a security guard's uniform. He said the victim told him that a "mulatto" had shot him and that three men had taken boxes from him containing Rolex watches. He said he took and secured the victim's weapon, a .45 caliber semi-automatic handgun. He said that semi-automatic handguns expel shell casings from the weapon when fired but that no shell casings were recovered at the scene.

Metropolitan Police Department Officer Charles Anglin testified that he was involved in the crime scene investigation at Green Hills Mall on March 17, 1999. He said that no shell casings were recovered during the investigation. He said the absence of shell casings was potentially significant because a semi-automatic ejects shell casings when it is fired but a revolver does not. On cross-examination, Officer Anglin admitted that he was unable to discover any fingerprints at the scene.

Michelle Nicholson testified that on March 17, 1999, she was traveling on Interstate 40, taking her son to school. She said she noticed a maroon van with Florida license plates driving erratically on Interstate 40, weaving in and out of traffic. She said she saw men in the van who were Hispanic. She said the van took the Hillsboro Road exit, which is the exit for Green Hills Mall. She said she learned later that a robbery occurred at the Green Hills Mall and that the suspects were Hispanic, traveling in a van. She said she called the police and told them what she had witnessed earlier in the day. She said, however, that she did not get a good enough look at the occupants of the van to identify anyone. On cross-examination, Ms. Nicholson admitted that the van she saw on the interstate had tinted windows in the middle.

Metropolitan Police Department Sergeant Freddie Stromatt testified that he worked in the Metropolitan Police Department's Robbery Division in March 1999. He said he was assigned to investigate the Green Hills Mall robbery. He said that based upon the information given by Ms. Nicholson, he sent detectives out to check motels along Interstate 40 to determine whether any Hispanic men had stayed at a motel on the night of March 16, 1999. Sergeant Stromatt said they were able to learn that four Hispanic men had stayed at a Howard Johnson located along Interstate 40 at Charlotte Pike, that the Hispanic men had filled out a registration card indicating they were driving a van with Florida license plates, and that the Hispanic men had checked out the morning of the robbery. Sergeant Stromatt said that after they were able to identify suspects, photograph arrays were taken to the motel and that the motel clerks were able to identify the Hispanic men who had stayed in the motel on March 16, 1999.

Sue Madan testified that she was the manager of the Howard Johnson on Charlotte Pike in March 1999. She said she gave to the police telephone records for the date in question and surveillance videotapes from five cameras. She said she talked to one of the Hispanic men who stayed at the motel but could not identify him. On cross-examination, Ms. Madan said that Rafael Cruz was listed on the registration card as occupying room 207 on the night of March 16, 1999.

Tiffany Dozier testified that she worked as a front desk clerk at the Howard Johnson on Charlotte Pike in March 1999. She said the Hispanic men stayed at the motel for three or four days. She said that one of the men acted as a spokesman for the group and that he flirted with her. She said at least five Hispanic men were in the group staying at the motel. She said the men were driving two different vans, one white and one maroon. Ms. Dozier said that in July 1999, Detective Tarkington asked her to look at some photograph arrays. She said she was able to identify the defendant as the man who spoke English and flirted with her and Jonathan Londono as the man who often

accompanied the defendant. On cross-examination, Ms. Dozier admitted that the person registered as Mr. Cruz occupied rooms 202, 204, 207, 210 and 212 between March 14 and March 17.

Robin Capps testified that she worked as a housekeeper at the Howard Johnson on Charlotte Pike in March 1999. She said that on March 17, 1999, she helped another housekeeper remove a seat that had been left in room 204. She said the seat looked like it was from a van.

Liliana Gonzalez testified that she worked in the pre-paid calling card business in Miami, Florida. She said that in March 1999, she was working for Gloria Telecommunications, which sold pre-paid calling cards in different parts of the United States but mainly in Miami. She said the Metropolitan Police Department asked her to determine if Gloria Telecommunications pre-paid calling cards had been used at certain Nashville area telephone numbers. She said that her research revealed that Gloria Telecommunications pre-paid calling cards had been used from the Nashville area telephone numbers the police had asked her to research. As a result of Ms. Gonzalez' testimony, the state introduced into evidence as an exhibit a listing of telephone records from Gloria Telecommunications.

Metropolitan Police Department Detective James Arendall testified that he was a robbery detective in March 1999. He said that while assisting in the investigation of the robbery at Green Hills Mall, he went to the Howard Johnson on Charlotte Pike. He said that in room 204, he found a pre-paid calling card that had been torn apart and a box of .357 caliber ammunition. He said that the box of ammunition held fifty rounds but that six or seven rounds were missing.

Detective Arendall said he returned to the Howard Johnson a few months later and showed some photograph arrays to Ms. Dozier, who identified the defendant as the man who spoke English and flirted with her. He said the Metropolitan Police Department's procedure for compiling a photograph array is to enter a suspect's physical characteristics into a computer. He said this produces about 7,000 results. He said the procedure then requires the officer to go through the pictures and find photographs that are similar to the photograph of the suspect. He said the photograph array shown to a witness will contain no information other than the pictures. He said that if a witness made a positive identification, they were presented with an identification form to sign. He said that the identification form had a "comments" section and that whatever the witness said, he would write it down. On cross-examination, Detective Arendall acknowledged that he only investigated room 204 and did not go to rooms 202, 207, 210, or 212.

Metropolitan Police Department Sergeant Johnny Hunter testified that in March 1999, he was assigned to the Technical Investigation Section of the Identification Division. He said he was called to the Howard Johnson on Charlotte Pike to process room 204. He said that he lifted fingerprints from a box of ammunition, a telephone book, and the room telephone. He said, however, that he did not do a comparison analysis on the fingerprints recovered from room 204. On cross-examination, Sergeant Hunter admitted that he was unable to lift fingerprints from any other surface area in room 204.

Tennessee Bureau of Investigation Agent Steve Scott testified that he worked in the bureau's crime laboratory in the Firearms Identification Unit. He said the Metropolitan Police Department sent him the bullet used to kill the victim for analysis. He said that the bullet was manufactured by Remington Peters Corporation and that it was either a .38 or .357 caliber bullet. He said it could have been either caliber because the bullets were interchangeable in a .357 magnum handgun. He said the bullet was fired from a revolver and not from an automatic.

Agent Scott testified that he also received the box of ammunition recovered from

room 204.  He said that the box held fifty rounds of ammunition but that six rounds were missing.  He said that most revolvers hold six bullets.  He said that in his opinion, the bullet recovered from the victim was consistent with the bullet cartridges recovered from room 204.  On cross-examination, Agent Scott admitted that the bullet recovered from the victim could have been fired from either a .38 caliber or a .357 caliber handgun and that the manufacturer of the weapon could not be determined.

Todd Hagedorn testified that he worked for Integraham St. Louis Seating.  He said his company manufactured seats for Daimler-Chrysler minivans.  He said he was familiar with the different types of seats his company manufactures for Daimler-Chrysler.  He said that he was asked to identify the seat found in room 204.  He said the seat came from a 1996 or 1997 model year Chrysler Town and Country minivan.

Lorita Marsh testified that she worked for the Metropolitan Police Department as a fingerprint analyst.  She said she compared the sets of fingerprints lifted from room 204 at the Howard Johnson motel with known sets of fingerprints from the defendant, Edwin Gomez, and Jonathan Londono.  She said the fingerprint lifted from the telephone book matched the right index fingerprint of the defendant.  She said the fingerprint lifted from the room telephone matched the right middle fingerprint of Edwin Gomez.  She said the fingerprint lifted from the box of Remington ammunition matched the right middle fingerprint of Jonathan Londono.  On cross-examination, Ms. Marsh acknowledged that she found the defendant's fingerprints only on the telephone book.

Officer Steven Kaufman testified that he was with the Police Operations Bureau in Florida, which he characterized as a special details unit.  He said that on March 1, 1999, he met with the defendant and his girlfriend at the defendant's apartment in Miami, Florida, as part of an official investigation.  He said that the defendant's telephone number at the apartment was 305-228-8973 and that the girlfriend's work telephone number was 305-640-2460.  The telephone records from Gloria Telecommunications reflect that on March 16, 1999, someone called 305-640-2460 using a telephone on the second floor of the Green Hills Mall just down the hall from the Carlyle and Company store.

Jim Spearman testified that he worked for BellSouth Telecommunications.  He said that he was the Corporate Security Manager for Middle Tennessee and that he also performed duties as the custodian of records.  He said that in his capacity as custodian of records, he occasionally testified in court about BellSouth telephone records.  He said he received a subpoena for the telephone records from the Howard Johnson located on Charlotte Pike and for other telephone records from subscribers located in and around Green Hills Mall.  He said the records reflected that calls were made from telephones at the Howard Johnson to two different toll free numbers:  800-464-3139 and 800-791-0964.  On cross-examination, Mr. Spearman acknowledged that he was unable to determine from which room the calls were placed.  As a result of Mr. Spearman's testimony, the state introduced various phone records as exhibits into evidence.  The records reflect that someone from the Howard Johnson motel used a Gloria Telecommunication calling card to place a telephone call.  They also reflect that someone called the defendant's telephone number in Miami from the Howard Johnson motel.

Barbara Franklin testified that she worked for Carlyle and Company in Green Hills Mall.  She said she was working the day before the robbery when two Hispanic men came into the store around 3:00 p.m.  She said one of the men asked her questions about the Rolex watches.  She said that he asked her if the store always had the watches and that she told him the watches were only there for a special showing.  Ms. Franklin identified the defendant as the Hispanic man who asked her questions about the Rolex watches on the day before the robbery.  She said the defendant had long hair that was "pulled back" when he was in the store.  On cross-examination, Ms. Franklin admitted that the police never showed her any photographs before the trial.  She maintained,

however, that she was certain the defendant was the man who asked her questions the day before the robbery.

Stacy Butts testified that she worked for Carlyle and Company in the Green Hills Mall. She said she was working the day before the shooting with Ms. Franklin. She said that on that day, she noticed two men talking to Ms. Franklin about the Rolex watches. Ms. Butts identified the defendant as one of the two men. She said the defendant's hair was shorter on the day before the robbery than it was at the trial. On cross-examination, she said she did not know if the defendant had a mustache on the day before the robbery.

Metropolitan Police Department Detective Harold Haney testified that he had been assigned to the Armed Robbery Unit in March 1999. He said that his role in the investigation of the robbery was focused initially on watching videotapes from the Howard Johnson motel. He said the videotapes showed a maroon van and a white van in the parking lot on the morning of March 17, 1999. He said the vans left the parking lot at 8:07 a.m.

Detective Haney said that about one year later, he and Detective Tarkington went to Miami, Florida, and talked to the defendant about the Green Hills Mall robbery. He said he told the defendant that his fingerprints had appeared in connection with the robbery at Green Hills Mall. He said he then asked the defendant if he knew anything about the robbery. He said the defendant told him that the defendant had heard that four men and a woman went from Miami to Nashville in two rented cars, that one of the men was named Julio, that Julio had died two weeks before the detectives arrived, that another man named Javier was involved, and that the men sold the watches for $200,000.00. Detective Haney said that during this conversation, the defendant claimed he was not involved in the robbery.

Detective Haney testified that he and Detective Tarkington had further conversations with the defendant. He said that during these conversations, the defendant told them he was not in Nashville on the day of the robbery. He said the defendant said he had heard that the reason the guard was shot was because he was reaching for his gun. He said the defendant maintained that he had just heard about this crime but that he was not in Nashville.

Detective Haney testified that during another conversation, the defendant "broke down and started crying." He said the defendant acknowledged "that we knew who all was there, that we had their names." He said the defendant told him that he was in Nashville and had stayed at the Howard Johnson motel with "Maria Charry," Jonathan Londono, Edwin Gomez, Javier and someone he knew only as Mosquito. He said the defendant admitted they had rented two rooms and were driving a maroon van and a white van. Detective Haney said that he told the defendant his fingerprints were on the seat left behind in room 204 and that the defendant said his fingerprints should not be on the seat because he had "wiped it off." He said the defendant admitted planning for the robbery. He said the defendant told him that the defendant and his confederates received about $230,000.00 for the watches. Detective Haney said the defendant admitted that his share was $40,000.00. He said the defendant admitted that they took a gun but disposed of it. Detective Haney said the defendant told him that during the robbery, the defendant and Maria were about one to two blocks away, waiting in the maroon van.

On cross-examination, Detective Haney acknowledged that the interview with the defendant lasted three to four hours. He said the defendant did not confess until the last hour. He acknowledged that he did not have a tape recording of the defendant's confession and that the defendant did not sign a confession.

Detective Tarkington testified that he was an investigator in the Robbery Unit. He

said he was assigned to work the Green Hills Mall robbery. He said that after a suspect was identified, he went to Ms. Sloan with a photograph array and asked her to identify anyone who looked familiar. He said the "standard procedure for me is to tell the person that the person whom [sic] is the subject of this investigation may or may not be in here. I need for them to look at each of the pictures and tell me if they recognize them and where they recognize them from." He said that Deborah Sloan looked at different photograph arrays and identified the defendant, Jonathan Londono, and Edwin Gomez as the robbers.

Detective Tarkington said he investigated two particular telephones in the Green Hills Mall area. He said the first telephone was located in front of the August Moon Restaurant and the second was located in the mall across from Carlyle and Company. Detective Tarkington also testified concerning the defendant's confession. His testimony in that respect was cumulative to that of Detective Haney.

The defendant testified that he lived in Miami, Florida. He said he made a trip with his girlfriend to Nashville in the middle of March 1999, driving a Nissan Sentra. He said that when he arrived in Nashville, he went to Hickory Hollow Mall where he saw some people he already knew. He said he could not remember their names but thought one was named Javier and another Julio. He said these people told him they did not have any form of identification and asked him for help in renting a room. He said he helped them rent a room at the Howard Johnson motel. He said he rented another room for himself and his girlfriend. He said he stayed in room 202 and the other people stayed in room 204. He said there were seven other people. He said that after he checked in, he went and knocked on room 204 and talked with the people inside. He said he used the telephone book in room 204 to look for a telephone number in the yellow pages to an escort service. He said he called the escort service for the people in room 204. He said he left Nashville a few days later and went to Louisville, Kentucky, and that from Louisville, he returned to Miami.

The defendant testified that Detectives Haney and Tarkington interviewed him about one year after he returned to Miami. He said he told the detectives about helping rent a room at the Howard Johnson for the people he knew. He said he told them that the other people wanted him to help them buy drugs but that he refused. The defendant denied confessing to the detectives but did admit checking into the Howard Johnson under an assumed name. The defendant testified that in March 1999, he had very short hair, that he did not have a ponytail, and that he did not have a mustache because his wife did not like facial hair.

On cross-examination, the defendant said that the name of the girl he was traveling with was Sandra but that he did not know her last name. The defendant admitted that when he was in Nashville, he called his wife in Miami at home and at her place of work with a phone card that he borrowed from the people in room 204. He said that his wife did not know he was with another woman and that he and his wife were in a fight at the time. He maintained that the detectives' testimony relating to his confession was false, that he did not go to Green Hills Mall, and that he did not go to Carlyle and Company and ask about Rolex watches. The defendant said he did not know if he went to any other malls in the Nashville area. The defendant admitted that he had previous felony convictions for burglary and theft.

*State v. Guartos*, No. M2003-03073-CCA-R3-CD, 2006 WL 163633, at *2–*10 (Tenn. Ct. Crim. App. Jan. 26, 2006).

The Tennessee Court of Criminal Appeals also considered the evidence introduced in connection with Guartos's motion for a new trial, which it summarized as follows:

At the motion for new trial hearing, Lorita Marsh testified that she examined the defendant's fingerprints and latent prints. She said she identified the prints on October 4, 1999, and October 3, 2000. She said she faxed a copy of the identification report to the district attorney's office before the trial. On cross-examination, Ms. Marsh admitted that the first identification she performed did not use prints obtained from the Nashville Police Department but were from another police department. She acknowledged that the second identification used prints collected from the defendant once he arrived in Nashville. She said the results of her examination of the prints in 1999 were the same as the results in 2000.

Kimberly Allison testified that she was present during jury selection. She said she did not point out the defendant to Ms. Sloan. She said she knew who the defendant was because he was the person sitting with the attorneys. She said she did look back into the courtroom after she had been excluded but did not recall whether Ms. Sloan did.

Maria Charry, the defendant's mother, testified that she was from Miami and had lived there for fifteen years. She said she understood English but did not speak it. She said she was in the courtroom when the trial started. She identified Ms. Sloan and Ms. Allison. She said that at the trial, she was outside the courtroom and saw Ms. Sloan and Ms. Allison looking through the window to the courtroom. She said that Ms. Allison pointed into the courtroom. Ms. Charry said she then walked over to the door, looked in, and saw her son, the defendant. On cross-examination, she acknowledged that she heard the trial judge tell the witnesses and jury that Mr. Guartos was standing trial. She acknowledged that she never heard what Ms. Allison and Ms. Sloan said while looking through the window.

Wanda Hiett testified that she was the court reporter during the defendant's trial. She said she listened to the tapes a second time and the transcript of Mr. Nagele's testimony was accurate. She said there was nothing in the testimony of Mr. Nagele to the effect that he crawled "military style." She said the transcript did not include the state's closing argument because the recorder stopped. She said she did not stop the assistant district attorney or record his closing statement on her stenograph machine because she did not consider the closing argument to be testimony. She said there was no way to recreate the assistant district attorney's closing argument. She said her notes reflected that the defendant failed to object during the state's closing argument, which lasted for twelve minutes. She acknowledged that the trial court did not interrupt the assistant district attorney during his closing argument.

Roger Moore, the assistant district attorney, testified that he did not remember his closing argument. He said he only remembered referring to the cost of the Rolexes as "costing a good man his life." He said he did not remember any objections or interruptions by the trial court during his closing argument.

Deborah Sloan testified that she did not look through the window with Ms. Allison during trial. She said she saw the defendant in the courtroom during voir dire. She testified to the following:

Q. Before you testified, did anyone ask you if he looked familiar to you?

A. Well, that morning, I had been introduced to, I suppose, Mr. Guartos when I got introduced to the Judge and all these people to make sure nobody was recognized or knew each other, I suppose, and then when I was on, after I left there, they wanted to know if I recognized him before, then I went back in to testify.

Q. And who asked you if you recognized anyone?

A. I don't really recall. I think it was either [the assistant district attorney] or the

victim's advocate lady—I'm not sure what her title is, but she had kind of shown us where to go that day and told us what to do and all that stuff.

Q.  So it was somebody from either the Police Department or the District Attorney's office?

A  Yes, yes.

Q.  And when you were asked either by [the assistant district attorney] or the lady from the DA's office if anyone looked familiar, what did you say?

A.  Yes.

Q.  Okay, and what did you tell them?

A.  That, yes, that was the man at the Green Hills Mall that day.

She said that she was told someone would testify about fingerprints and that she understood this to mean the state would introduce fingerprint evidence.

Q.  Do you recall what it is that they did tell you?

A.  I was told that morning, the morning of court, that—actually, what I was told, the best I recall, is that I had asked how long it was going to take, and the response was a couple of days or more, that there is a lot of witnesses and the fingerprint people have been called and I honestly, I guess I could even say that my assumption was that meant that there was evidence.  I don't think anyone—I was actually very frustrated that no one would tell me anything before the trial, so I guess I probably inferred, I suppose, that that meant obviously there was some kind of fingerprint evidence, but that there were no names or information or where or anything given to me at all for sure.

Q.  Okay, and the only person being tried in that first trial was Mr. Guartos.

A.  That's right.

Q.  And so is it fair to say, Ms. Sloan, that you believed that or you could infer that there was fingerprint evidence against him?

A.  Actually, I can tell you for sure that I was not sure who it was on because by then, I had already ID them, all of them, and I knew that all of them were involved, regardless of who was being tried that day, so I'm not, like I said, nobody gave me any name of which it was on, but I kind of assumed they were sort of all related.

Ms. Sloan said she identified the defendant in a photograph array sometime after the robbery.  She identified a form that she admitted signing.

Q.  Okay. Is there a place on the form where you said you identified him?

A.  There is a place for me to sign where it says signature of person making the identification, and that is all I was asked to do is to sign my name on that line.

Q.  Before or after it was filled out?

A.  After it was filled out with the words, the detective wrote those words, and he asked me if those are the words that I said, and I said, yes, it is, and he said can you please sign here where it says signature of person making identification, and that is where I signed it.

THE COURT: What were those words?

A. Number two looks familiar. Number three's face looks familiar but hair would be shorter. She continued to look at photo number two.

She testified that her voice was the voice on the 9-1-1 tape but that the tape did not include her giving directions to the 9-1-1 operator to her location. After defense counsel showed her a mug shot taken of the defendant two weeks before the crime, Ms. Sloan said the photograph looked familiar but she did not know for sure who it was. She said she was not sure that the photograph was a picture of the shooter but she believed that she saw the man in the photograph the day of the shooting. She said that she did not remember the length of the defendant's hair or whether he was wearing a hood over his head. In the defense's offer of proof, Ms. Sloan acknowledged that the forms for her identifications of the two co-defendants were marked as positive identifications, but the form on the defendant contained only comments and was not marked as a positive identification. Ms. Sloan admitted that her car had tinted windows.

Detective Tarkington testified that no physical lineups were conducted in this case. He said that he took notes on a notepad while the defendant was interviewed. He said that once he reduced his handwritten notes to typewritten form, he discarded the handwritten notes. He said he did not read the defendant his Miranda rights when he interviewed the defendant in Miami. He acknowledged that he testified at the trial that the interview with the defendant lasted about four hours. He also acknowledged, after being shown the movement sheets from the jail in Miami, that the interview may have lasted only two hours. He said three other officers participated in the defendant's interview. He said that he interviewed a woman while in Miami but that he was unable to ascertain her true identity. He acknowledged he sent a letter to Ms. Franklin when he could not get in contact with her through telephone calls. He admitted the statements the defendant made to him after the defendant arrived in Nashville may not have been included in the file given to the district attorney's office.

The defendant's trial attorney testified that he was not aware of the defendant's statement made to Detective Tarkington in Nashville or the 1999 mug shot. He said he became the attorney of record only six weeks before the trial. He said he did not obtain the Florida jail movement sheets because he did not know the length of the interview would be an issue until he got to trial. He said he did not know that Detective Tarkington destroyed his notes until after trial and that the state never told him about the destroyed notes. He said that he filed a discovery motion but that the state told him to get the discovery material from the file or from the public defender's office. He said that he obtained audio tapes of interviews of Ms. Franklin and Ms. Butts and a videotape of Mr. Nagele's interview but that he never played them for the defendant. He said he was aware that identification was an issue in this case but was unaware that anyone could identify the defendant as being at the scene. He testified that if he had had the mug shot, he would have used it to cross-examine Ms. Sloan. He said that he did not have a copy of the police report stating someone called an escort service from the Howard Johnson motel. He said he did not have the newspaper article written near the time of the shooting. He acknowledged he did not file a motion to suppress the statement or a motion about the identification issues. He acknowledged the state provided *Jencks* material and the tapes before the trial.

The defendant testified that he was arrested in Miami on March 1, 1999, and that the police department took his mug shot. He said he knew about the mug shot but did not tell his attorney about it. He said his attorney told him that no one at the mall at the time of the shooting could identify him. He identified a photograph taken of him in Nashville in 2000. He said that his hair was long on top in the picture but even longer at the trial. He said in March 1999, his hair was short. He said that when the Nashville police officers interviewed him both in Miami and in Nashville, he asked for his lawyer and was not read

his Miranda rights. He testified he did not make the statements to Detective Tarkington in Miami that were introduced at the trial. He said that in his Nashville interview, he told Detective Tarkington that he could not talk to him without his lawyer and that the detective returned him to his cell. He identified the picture of himself used in the photograph array as having been taken in 1995 or 1996. He said that he testified at the trial that his fingerprint was on the telephone book because he called an escort service. He said that there was no other evidence to support his statement about the fingerprints at the trial but that Detective Haney's report would have corroborated his trial testimony. He acknowledged the arresting officer from his March 1999 case in Miami testified at the trial. The defendant acknowledged that on cross-examination, he did not ask the officer from Miami about the length of his hair in March 1999.

Detective Haney testified that the interview of the defendant in Miami could have lasted only two hours though he testified at the trial that it was three and a half to four hours. He said that he was writing notes but that he only wrote one to two pages. He said he brought the notes back to Nashville, compared them to Detective Tarkington's notes, and destroyed them after the trial. He said there was nothing in his notes that could have added to or taken away from the supplement typed up by Detective Tarkington. He said he did not tell the prosecution about the destroyed notes. On cross-examination, Detective Haney acknowledged he did not have a watch or clock in the interview room. He acknowledged that during the trial, neither the state nor the defendant asked him about his notes.

Assistant District Attorney General Bret Gunn testified that he was primarily responsible for discovery. He said he disclosed all of the descriptions of the potential suspects in the various discovery responses. He said he had never seen the mug shot taken of the defendant in Miami. He said that Ms. Sloan's telephone call was prematurely disconnected in the 9-1-1 tape and that he never had any other 9-1-1 tape of her telephone call. He said he did not know anything about the detectives' handwritten notes. He said he was not aware that Detective Tarkington talked to the defendant once he was extradited to Nashville. He said that if he had known about the statement made by the defendant in Nashville, he would have used it at the trial. He said he never questioned Ms. Sloan about her windows being tinted because it was not in any of the reports. He said there was no indication that Ms. Sloan could not see out of her car windows. He said that he disclosed all the tapes he was provided and that he did not know until the second trial that a microcassette of an interview with Mr. Nagele existed. He said that if he had known about the microcassette tape, he would have disclosed it but that the tape contained nothing exculpatory.

On cross-examination, General Gunn said that undeveloped photographs in the case existed, were made available to be copied from the property room, and included photographs of Ms. Sloan's car. He acknowledged someone from his office probably asked Ms. Sloan if she recognized anyone from the day of the incident. He acknowledged Ms. Sloan and other witnesses were in the courtroom when Mr. Guartos was identified as the defendant. He said that he reviewed the microcassette tape of Mr. Nagele's interview and that the tape did not contain additional information to what Mr. Nagele said in his videotaped or written statements. He acknowledged the transcript of the microcassette stated that the defendant was wearing a hood over his head but said he could not remember if Mr. Nagele testified to that at the trial.

The defendant introduced into evidence certain exhibits of relevance to this appeal: a police report prepared by Detective Tarkington containing the statements of a confidential informant and filed under seal, a police report prepared by Detective Haney concerning the escort service, a mug shot taken of the defendant on March 1, 1999, in Miami, the photograph array shown to the witnesses in Nashville, and a newspaper article. The police report prepared by Detective Tarkington filed under seal contains

> evidence gathered from a confidential informant, the report prepared by Detective Haney states that someone from room 204 called an escort service, the mug shot of the defendant shows that he had very short hair, but the photograph from the photograph array shows the defendant with longer hair on top and in the back but shorter on the sides. The newspaper article, published in the Tennessean on March 18, 1999, stated that Ms. Sloan "crouched down in her seat, told her boys to be quiet and hoped the men would not see her."

*Id.* at *11–*15.

On the basis of this evidence, the appellate court affirmed the trial court's judgment in all respects.[2]

**B. Post-Conviction Evidence**

The state appellate court summarized the evidence presented at the post-conviction hearing as follows:

> [T]he Petitioner testified that he had completed the ninth grade and that he was twenty six or twenty seven when arrested on these charges. The Petitioner said that he was originally appointed a public defender but that, after the trial date was already set, he hired Counsel to handle his case. The Petitioner recalled that Counsel told him that the State did not have any witnesses who could identify him. At trial, however, several of the State's witnesses identified the Petitioner. Some of these witnesses testified that the Petitioner had long hair at the time of the crime, and the Petitioner testified that this could have been contradicted by a mug shot taken of him by Miami police after his arrest ten to fifteen days before the crime in this case occurred. The Miami mug shot depicted his hair in a "military cut" and "real short all over." The mug shot also portrayed his skin as being light, contradicting the testimony of the State's witnesses that described him as "dark-skinned." The Petitioner said that Counsel was ineffective because he failed to obtain this Miami mug shot and use it at trial to challenge the State's witnesses' identification of the Petitioner.
>
> The Petitioner also complained that Counsel did not obtain or use a newspaper article written about the robbery to challenge Sloan's identification of the Petitioner. The article indicated that Sloan's car, from which she viewed the robbery, had tinted windows. The Petitioner testified that he only learned of the article because lawyers at his co-defendants' trial offered it in his co-defendant's defense.
>
> The Petitioner testified that Counsel failed to provide him with or use at trial a recorded statement about the robbery made by the surviving security guard. The Petitioner said that he believed that Counsel could have used the statement to challenge the security guard's testimony at trial about the specific location of the robbery within the parking garage.
>
> The Petitioner said that Counsel did not adequately investigate the case because Counsel did not speak with Sloan or review the security guard's statement. The Petitioner further stated that "they" said the robbers were wearing hoods and masks and that Counsel failed to "investigate" this claim.
>
> Finally, the Petitioner said that Counsel rendered ineffective assistance because he failed to obtain "movement sheets" from the jail in Miami where the Petitioner was

[2] This judgment was reversed only insofar as concerns the sentence. As set forth above, resentencing at a later date resulted in a four-year reduction in the petitioner's effective sentence.

incarcerated when Nashville detectives interviewed him about this case. According to the Petitioner, the movement sheets, which document how long an inmate is with a visitor, indicated that the interview with Nashville detectives lasted for an hour and twenty minutes. Detective Tarkington testified at trial that the Petitioner was interviewed for a longer period of time. The Petitioner testified that this discrepancy proved the detectives were lying and that Counsel should have obtained these records for use at trial.

The Petitioner testified that Counsel discussed with him the Miami interview with the Nashville detectives and that the Petitioner told Counsel that he never made any statements about the robbery to the detectives. The Petitioner complained that Counsel never challenged the introduction of the statements from this Miami interview, even though the Petitioner told Counsel that the only thing he said to the detectives in Miami was that he wanted an attorney.

On cross-examination, the Petitioner agreed that he received discovery in this case, which included the photographic line-ups shown to the witnesses and their identifications of the Petitioner from the line-ups. The Petitioner said that the picture used in these photographic line-ups was an older picture of the Petitioner taken when his hair was longer. The Petitioner acknowledged, however, that he never told Counsel that more recent mug shots existed that were taken ten to fifteen days before this incident that depicted the Petitioner with a different hair length. The Petitioner explained that he did not mention it because Counsel had told him that none of the witnesses could identify the Petitioner.

The Petitioner agreed that, because nothing in the discovery response indicated how long the Nashville detectives interviewed the Petitioner in Miami, Counsel had no way of knowing what the detectives' testimony at trial concerning the length of the Miami interview would be.

The Petitioner agreed that he testified at trial that the police were lying about any admissions made by the Petitioner during the Miami interview. The Petitioner acknowledged that he did not tell the jury that the Miami interview was shorter than the detectives testified to at trial, but he explained that he did not do so because, at the time of trial, he did not remember how long the interview had lasted.

The Petitioner agreed that he never requested a continuance of his trial and that he did not request that the trial court remove Counsel from the case. He said that, at the time he hired Counsel, the trial court made it clear that the trial date was scheduled and would not be moved. He further agreed that he and his family made the decision to retain Counsel, despite the limited time Counsel had to prepare for the trial.

Counsel testified that he had practiced law for twelve years and during that time had tried at least thirty cases. Counsel testified that he had represented clients on homicide charges in "several dozen" cases and had tried two homicide cases prior to representing the Petitioner. Counsel said that the Petitioner contacted and retained him approximately two months prior to the trial date in this case. The first time that Counsel appeared in court on the Petitioner's behalf, the trial court made it "very clear" that the trial date for this case would not be changed because one of the co-defendants to these crimes had raised a speedy trial claim and the co-defendant's case would not be heard until after the Petitioner's case. This allowed Counsel approximately six weeks to prepare for the Petitioner's trial. Counsel said that, when the trial court asked if he could be prepared for the Petitioner's trial by the trial date, he had no doubt that he could do so.

In preparation for trial, Counsel testified that he reviewed the discovery materials and went over them with the Petitioner. Counsel identified some of the issues he expected to be important at trial. Counsel interviewed some of the witnesses, but was unable to make contact with "a couple" of the other witnesses. Counsel said that the Petitioner's

family, who was paying for Counsel's fees and the case expenses, could not afford to hire a private investigator, so Counsel had to do all the investigatory work on his own during a very short period of time. Counsel agreed that neither he nor the previous attorney who represented the Petitioner filed any motions to suppress. Counsel agreed that, at the time of trial, he believed the identifications might not be "very clear or very positive identifications." Counsel did not recall specifically whom he interviewed, but recalled interviewing one or two of the witnesses from the parking garage and one of the jewelry store employees.

Even though Counsel did not think the witness identifications would be "positive," one of the witnesses, Sloan, identified the Petitioner at trial. Counsel testified that he challenged this identification through a line of questioning that included the angle and position from which the witness saw the events, the lighting at the scene, and any possible distractions at the scene. Counsel said that, through his questioning, he raised issues of whether the witness had the ability and the time to see someone and then at a later date identify the suspect.

Counsel testified that he never obtained the Miami mug shot taken shortly before this incident. Counsel agreed that the Petitioner told him that he had been arrested in Miami before this incident for a domestic disturbance. The Petitioner, however, never mentioned that the mug shot depicted the Petitioner with a different hair length. Counsel testified that he did not attempt to get the Miami inmate movement records because he did not have time to do so. Counsel recalled that he contacted the Petitioner's attorney in Miami, but he did not recall the result of this contact. While unsure of the exact date, Counsel said that he spoke with Mr. Nagele, the security guard. He could not remember, however, whether he knew that Mr. Nagele made previous statements regarding the robbery, but said he would have attempted to obtain any such statements for use at trial if he had known they existed. After the trial, Counsel was made aware that there was a tape recording of Mr. Nagele's statements about the robbery, which he agreed he could have used to impeach Mr. Nagele in the event he made an inconsistent statement during the trial. Counsel testified that he listened to audiotaped recordings of other witnesses' statements and that, although he was unable to play them for the Petitioner, he relayed the contents of the recordings to the Petitioner.

Counsel testified that he discussed with the Petitioner statements the Petitioner made during the Miami interview and that the Petitioner said he never made any incriminating statements to the detectives. Counsel, who had interviewed the detectives before trial, attempted to elicit testimony from them during trial to support the Petitioner's contention that he did not make any incriminating statements. Counsel agreed that he did not file a motion to suppress the detectives' testimony about the Petitioner's statements, but rather tried to impeach their testimony. Counsel said that he did not learn until after the trial that the detectives had handwritten notes from the interview.

On cross-examination, Counsel agreed that, while some witnesses to the robbery could not conclusively identify the Petitioner, there existed other incriminating evidence against the Petitioner: the Petitioner's fingerprints in the hotel room, phone records placing the Petitioner at Green Hills Mall, and the Petitioner's incriminating statements. Counsel testified that the Petitioner never told him that he invoked his right to an attorney when he met with Nashville detectives in Miami or that the detectives did not honor that request. In reference to that interview, all the Petitioner told Counsel before trial was that he spoke with the detectives but did not make any incriminating statements. Counsel said that, based upon what he knew at the time of trial, he did not think he could have prepared for the Petitioner's trial any differently.

David Raybin, who represented the Petitioner at his motion for new trial hearing but had since withdrawn from representing the Petitioner, testified that he had practiced law for thirty-five years and that his primary area of practice was criminal defense. Raybin

estimated that he had taken 100 cases to trial in both state and Federal court. Raybin testified that he had written multiple law review articles, articles for the bar association, and a three-volume treatise on Tennessee criminal law. Raybin said that he had testified at least five times as an expert witness on the issue of standard of care of criminal defense attorneys in post-conviction hearings. In preparation for this hearing, Raybin said that he reviewed his notes, his appellate brief in this case, and his correspondence file. Raybin explained that he was retained by the Petitioner and his family in May 2001 for post-trial matters and a potential appeal. At this point during Raybin's testimony, the Petitioner's attorney requested that Raybin be treated as an expert witness, to which the State objected. The trial court told the Petitioner's attorney to first question Raybin as a "fact witness" and then question Raybin as an "expert witness."

Raybin testified that, after being retained for this case, he met with the Petitioner at the penitentiary several times, he requested Counsel's file, acquired discovery, and requested a trial transcript in preparation to amend the Petitioner's motion for new trial. Raybin said that identification was one of the primary grounds for the Petitioner's motion for new trial based upon a mug shot taken shortly before this incident that depicted the Petitioner with short hair. Raybin testified that he obtained the photograph from the Miami Police Department and found it "significant" because the Petitioner's short hair was inconsistent with eyewitness testimony. Raybin said that he discussed the issue of hair length with the Petitioner but that Raybin was the one who initiated the discovery based upon the identification issue. Because Raybin believed identification to be the central issue in this case, he wanted to know the length of the Petitioner's hair and confirmed it with the police photograph.

Raybin testified that he also met with the attorney representing the Petitioner's co-defendant and discussed that trial at great length. He also reviewed all of the documents from the co-defendant's trial.

In preparing for the motion for new trial, Raybin said that he discussed proceeding on an ineffective assistance of counsel claim with the Petitioner, but that he recommended they first attack procedural errors. Raybin admitted that they could have proceeded on an ineffective assistance of counsel claim, but explained that he determined that to first raise the procedural errors and then later file a post-conviction petition was more advantageous. Raybin testified that the decision was ultimately his as to whether to raise the ineffective assistance issue but that the Petitioner agreed with Raybin's approach.

At this point in the hearing, the Petitioner's attorney again requested that Raybin be submitted as an expert witness. The State objected again based upon Raybin's advocacy in this case. The trial court overruled the motion and allowed the following to be admitted as expert testimony: Raybin testified that, in his opinion, Counsel "was not involved in the case long enough to have developed a sufficient degree of investigation." Raybin said that the central problem in this case was the "inadequacy of the defense." Raybin said that, because identification in the case was "very weak," the mug shot taken just before this offense was important. Obtaining the mug shot, according to Raybin, was "within the realm of normal behavior, normal things that should have been done." Raybin said that a motion to suppress the Petitioner's statements to detectives should have also been filed. Raybin obtained the jailtime logs indicating that the interview with detectives was two hours, which was inconsistent with the detectives' testimony at trial. Raybin said that Counsel should have requested the Petitioner be allowed to leave the court room during the testimony of witnesses who had not been shown a police line-up. He stated that, at the very least, all witnesses should have been shown a line-up before they testified at trial in order to prevent an in-court identification as happened in the Petitioner's case.

On cross-examination, Raybin agreed that there was not any case law, statute, or rule requiring the State to conduct out-of-court identification procedures. Raybin

explained that, even though the State is under no obligation to perform an out-of-court identification, if they refused the request to do so, a defense attorney could "make an issue of it" much like in cases where the State withholds or destroys evidence. Raybin said that a finding that an attorney is ineffective for not doing something of which there is no case law to support him trying to do, is "common sense." Raybin also agreed that no law requires a trial court to prohibit a witness who has not viewed a photographic line-up from taking the stand and identifying a perpetrator. Raybin maintained that an attorney could ask for a pretrial line-up and, if the State refused, make the jury aware of the refusal.

Raybin testified that, if an attorney asks a client if he requested an attorney before a police interview and the client says "no," then the attorney is not ineffective for failing to file a motion to suppress on that bases, but that an attorney must inquire as to whether the client invoked his right to counsel prior to police questioning.

Upon questioning from the court, Raybin testified that he reviewed the Public Defender's office case file and that the Public Defender's office did not file any suppression motions in this case. Raybin said that the Public Defender's office did not attempt to get the Petitioner's Miami mug shots. Raybin agreed that the phone records placing the Petitioner at Green Hills Mall was a significant problem in this case and inconsistent with the Petitioner's trial testimony that he was not at the Green Hills Mall.

Norris Tarkington and Harold Haney, Metropolitan Nashville Police Department detectives, both testified that the Petitioner never requested an attorney when they interviewed him in Miami and that he never tried to terminate the interview.

*Guartos v. State*, No. M2010-00801-CCA-R3-PC, 2011 WL 2682184 (Tenn. Ct. Crim. App. July 8, 2011).

## III.    ISSUES PRESENTED FOR REVIEW

In his present petition, Guartos asserts the following claims for relief:[3]

Claims 1, 9 and 17:  Whether the petitioner was denied effective assistance of counsel based upon trial counsel's failure to meet with the petitioner to discuss evidence, possible defenses, and other trial-related matters.

Claims 2 and 11:  Whether the petitioner was denied effective assistance of counsel based upon trial counsel's failure to investigate witnesses and potential witnesses.

Claim 3:  Whether the petitioner was denied effective assistance of counsel based upon trial counsel's failure to investigate possible defenses.

Claims 4 and 6:  Whether the petitioner was denied effective assistance of counsel based upon trial counsel's failure to properly investigate and prepare for trial.

Claim 5:  Whether the petitioner was denied effective assistance of counsel based upon trial

---

[3] The Court has consolidated some of the claims that are duplicative. The numbering of the issues does not match the petitioner's, who consolidated numerous claims under each "ground" for relief. For purposes of minimizing confusion, the numbering does mirror that of the respondent.

counsel's failure to subject the prosecution's case to meaningful adversarial testing.

Claims 7 and 16: Whether the petitioner was denied effective assistance of counsel based upon trial counsel's failure to file a motion to suppress evidence, in particular a motion to suppress statements made by Guartos in an interview by Metro Nashville detectives while the petitioner was in jail in Miami, Florida.[4]

Claim 8: Whether the petitioner was denied effective assistance of counsel based upon appellate counsel's failure to raise ineffective-assistance claims on direct appeal.

Claim 10: Whether the petitioner was denied effective assistance of counsel based upon trial counsel's failure to raise a *Brady* claim.

Claim 12: Whether the petitioner was denied effective assistance of counsel based upon trial counsel's failure to investigate witness identification.

Claims 13 and 15: Whether the petitioner was denied effective assistance of counsel based upon trial counsel's failure to investigate "recorded statements" and "tape recordings."

Claim 14: Whether the petitioner was denied effective assistance of counsel based upon trial counsel's failure to investigate telephone records.

Claim 18: Whether the petitioner was denied effective assistance of counsel based upon trial counsel's failure to challenge the testimony of the "woman who supposedly witnessed the burglary and murder." (ECF No. 1, at 6.)

Claim 19: Whether the petitioner was denied effective assistance of counsel based upon trial counsel's failure to object to prosecutorial misconduct.

Claim 20: Whether the State committed prosecutorial misconduct by forcing or coercing Deborah Sloan, Barbara Franklin, and Stacy Butts to testify against Guartos at trial.

Claim 21: Whether the State committed prosecutorial misconduct by stating during closing

---

[4] Under Ground One in his petition, Guartos raises a very general claim that his trial counsel "failed to investigate potential witness(s), witness identification by mug shot, recorded statements, telephone records, *motion to suppress statements, tape recordings, interview by Metro Detective(s) in Miami, Florida for failure to read Petitioner his Miranda rights. . . .*" (ECF No. 1, at 6 (emphasis added).) The Court reads the italicized portion of the quoted language as a claim that petitioner's trial counsel was ineffective for failing to file a motion to suppress the petitioner's statements in the interview by Metro (Nashville) Detectives when the petitioner was in Florida, based on a violation of his Miranda rights. The Government inexplicably construes this portion of Ground One as including a claim that the petitioner was denied effective assistance of counsel by trial counsel's failure to interview a Florida detective. (ECF No. 29, at 35, ¶ 16.)

argument that the "paper was wrong."  (ECF No. 1, at 7.)

Claim 22:   Whether the State committed prosecutorial misconduct by falsifying statements and documents of phone records for March 17, 1999.

Claim 23:   Whether the State committed prosecutorial misconduct by withholding audiotapes of an interview with Eugene Nagele.

Claim 24:   Whether the State committed prosecutorial misconduct by failing to disclose portions of witness statements.

Claim 25:   Whether the State committed prosecutorial misconduct by withholding police reports and witness statements concerning the petitioner's March 15, 2000 interview with detectives.

Claim 26:  Whether the State committed prosecutorial misconduct by introducing in-court and out-of-court identification by Deborah Sloan and in-court identification by Stacy Butts.

Claim 27:   Whether the State committed prosecutorial misconduct by discarding notes from Detective Norris Tarkington.

Claim 28:  Whether various statements made to law enforcement agents in the wake of Guartos's arrest were admissible at trial when the State failed to carry its burden of showing that Guartos's relinquishment of his *Miranda* rights was voluntary.

Claim 29:  Whether Guartos's post-arrest statements to law enforcement officials from the Metro-Nashville Police Department in Miami, Florida were admissible when Detective Tarkington did not read Guartos his *Miranda* rights.

Claim 30:   Whether Deborah Sloan's identification of the petitioner at trial violated due process because it was the product of suggestive identification procedures.

Claim 31:  Whether the evidence was sufficient to support Guartos's convictions.

Claim 32:  Whether Guartos is "actually innocent" of the crimes for which he was convicted.

Claims 33, 35, 48, 50, and 52:  Whether Guartos should be granted a new trial because of "newly discovered evidence," including photographs and mug shots contemporaneous with the criminal offense, a newspaper article reporting that witness Deborah Sloan was "crouched down in her seat," reports of the Dade County Police Department showing the time of Guartos's confinement during his interrogation, that police officers destroyed their handwritten interview notes after interviewing Guartos, and the petitioner's

post-arrest statement to the police.

Claim 34: Whether Guartos was denied due process by identification procedures that used a mug-shot photograph that was several years old instead of a contemporaneous photograph that was available from a mug shot taken just two weeks before the offenses of conviction were committed.

Claim 36: Whether Guartos was denied due process when the State failed to disclose that Deborah Sloan had tinted windows in her vehicle.

Claim 37: Whether Guartos was denied due process by the suggestive line-up procedures employed by Detective Tarkington.

Claim 38: Whether Guartos was denied due process by the inconsistent testimony of Deborah Sloan.

Claim 39: Whether Guartos was denied due process by the in-court and out-of-court identification of petitioner made by Deborah Sloan.

Claim 40: Whether Guartos should be granted a new trial because witness Kimberly Allison told Deborah Sloan who the petitioner was during trial.

Claim 41: Whether Guartos was denied due process when the State failed to provide all of witness Eugene Nagele's statements, in violation of Rule 26.2 of the Tennessee Rules of Criminal Procedure.

Claim 42: Whether Guartos was denied due process by the State's failure to produce the entire 911 call by witness Deborah Sloan.

Claim 43: Whether Guartos was denied due process when the State failed to turn over tape recordings of statements by witness Christina Hudson and witness Barbara Franklin, in violation of *Brady v. Maryland.*

Claims 44 and 45: Whether Guartos was denied due process by the in-court identifications of him by witnesses Barbara Franklin and Stacy Butts.

Claim 46: Whether Guartos was denied due process and equal protection by the failure of the court reporter to transcribe the State's closing argument.

Claim 47: Whether the statement taken by Nashville police in Miami, Florida was unlawful because Guartos repeatedly requested to see his attorney.

Claim 49: Whether the State violated Rules 16 and 26.2 of the Tennessee Rules of Criminal Procedure and Guartos's due process rights when the police officers' notes of their interview of the petitioner on March 15, 2000 were destroyed.

Claim 51: Whether Guartos was denied due process by the State's failure to comply with Rule 16 of the Tennessee Rules of Criminal Procedure, requiring the disclosure of all statements made by the petitioner.

Claim 53: Whether the State violated *Brady* by failing to disclose to Guartos the contents of an interview with an individual who was interviewed just before Guartos in March 2000 in Florida.

Claim 54: Whether Guartos was denied due process by the State's failure to disclose a police report of Detective Haney, as required by the Tennessee Rules of Criminal Procedure.

Claim 55: Whether Guartos was denied due process by the misleading characterization of telephone records as having occurred on March 17, 1999.

Claim 56: Whether the trial court erred in admitting impermissible hearsay evidence in the form of police reports as to Guartos's address and phone numbers.

Claim 57: Whether the trial court erred in imposing the maximum sentences in violation of *Blakely v. Washington*.

Claim 58: Whether the trial court erred in imposing consecutive sentences in violation of *Blakely v. Washington*.

 (ECF No. 1, at 5–16.)

The Court also broadly construes the petition as alleging that the cumulative effect of counsel's errors entitles him to a new trial.

## IV.     STANDARD OF REVIEW

A federal district court will not entertain a petition for writ of habeas corpus unless the petitioner has first exhausted all available state-court remedies for each claim in his petition.  28 U.S.C. § 2254(b)(1).  While exhaustion is not a jurisdictional requirement, it is a strictly enforced doctrine which promotes comity between the states and the federal government by giving the state an initial opportunity to pass upon and correct alleged violations of its prisoners' federal rights.  *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).  Consequently, as a condition precedent to seeking federal habeas corpus relief,

the petitioner is required to fairly present his claims to every available level of the state court system. *Rose v. Lundy*, 455 U.S. 509, 518–20 (1982); *see also Duncan v. Henry*, 513 U.S. 364, 365–66 (1995) ("[A] federal habeas petitioner . . . [must] provide the state courts with a 'fair opportunity' to apply controlling legal principles to the facts bearing upon his constitutional claim."). Moreover, "the doctrine of exhaustion requires that a claim be presented to the state courts under the same theory in which it is later presented in federal court." *Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998). Once his federal claims have been raised in the highest state court available, the exhaustion requirement is satisfied, even if that court refused to consider the claims. *Manning v. Alexander*, 912 F.2d 878, 883 (6th Cir. 1990).[5]

A habeas petitioner bears the burden of demonstrating that he has properly and fully exhausted his available state court remedies with respect to the claims he presents for federal habeas review. *Prather v. Rees*, 822 F.2d 1418, 1420 n.3 (6th Cir. 1987) (citation omitted). If a habeas petitioner retains the right under state law to raise a claim by any available procedure, he has not exhausted that claim. 28 U.S.C. § 2254(c). Ordinarily, habeas petitions containing unexhausted claims are dismissed without prejudice in order to permit the petitioner the opportunity to pursue them in state court. *Alley v. Bell*, 307 F.3d 380, 385 (6th Cir. 2002) (citing *Rose*, 455 U.S. at 518, 520–22); *see also Rhines v. Weber*, 544 U.S. 269 (2005) (reconfirming the continued relevance of *Rose* under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")).

If, however, an unexhausted claim would be procedurally barred under state law, for instance by statutes of limitations or state rules barring successive petitions, then the claim is deemed exhausted (because no further state review is available) but procedurally defaulted, and may not be considered by the federal court on habeas review except under extraordinary circumstances. *Alley v. Bell*, 307 F.3d 380, 385–86 (6th Cir. 2002) (citations omitted); *In re Cook*, 215 F.3d 606, 607–08 (6th Cir. 2000). Specifically, in order to obtain consideration of a claim that is procedurally defaulted, a petitioner must demonstrate both cause for the procedural default and actual prejudice resulting from the alleged constitutional errors, or alternatively that failure to consider the claims will result in a "fundamental

---

[5] In Tennessee, review by the state Supreme Court is not required for exhaustion. Instead, "once the Court of Criminal Appeals has denied a claim of error, 'the litigant shall be deemed to have exhausted all available state remedies available for that claim.'" *Adams v. Holland*, 330 F.3d 398, 402 (6th Cir. 2003) (quoting Tenn. S. Ct. R. 39).

miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *cf. Murray v. Carrier*, 477 U.S. 478, 485 (1986); *Engle v. Isaac*, 456 U.S. 107, 129 (1982); *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).

Even when a petitioner's application for a writ of habeas corpus raises only federal constitutional claims that have been properly exhausted in the state courts, this Court's review of the state court's resolution of those issues remains quite limited. The standard for reviewing applications for the writ of habeas corpus is set forth in 28 U.S.C. § 2254(d). This section states:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

*Id.* In other words, a federal court is bound by a state court's adjudication of a petitioner's claims unless the state court's decision was contrary to or involved an unreasonable application of clearly established federal law. *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000); *Franklin v. Francis*, 144 F.3d 429, 433 (6th Cir. 1998). Additionally, this court must presume the correctness of state court factual determinations, and the petitioner has the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see also Cremeans v. Chapleau*, 62 F.3d 167, 169 (6th Cir. 1995) ("We give complete deference to state court findings unless they are clearly erroneous."), *abrogated on other grounds by Thompson v. Keohane*, 516 U.S. 99, 111 (1995).

The United States Supreme Court has explained the proper application of the "contrary to" clause as follows:

> A state-court decision will certainly be contrary to [the Supreme Court's] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases. . . . A state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from [this Court's] precedent.

*Williams v. Taylor*, 529 U.S. 362, 405–06 (2000) (citation omitted).

With respect to the "unreasonable application" clause of § 2254(d)(1), the Supreme Court has held that a federal court should analyze a claim for habeas corpus relief under the "unreasonable

application" clause when "a state-court decision unreasonably applies the law of this Court to the facts of

a prisoner's case." *Id.* at 409. The Court defined "unreasonable application" as follows:

> [A] federal habeas court making the "unreasonable application" inquiry should ask
> whether the state court's application of clearly established federal law was objectively
> unreasonable. . . .
>
> . . . . [A]n *unreasonable* application of federal law is different from an *incorrect*
> application of federal law. . . . Under § 2254(d)(1)'s "unreasonable application" clause,
> then, a federal habeas court may not issue the writ simply because that court concludes
> in its independent judgment that the relevant state-court decision applied clearly
> established federal law erroneously or incorrectly. Rather, that application must also be
> unreasonable.

*Id.* at 409–11 (emphasis original).

With these principles in mind, the court will turn to the examination of the claims raised in

Guartos's petition for habeas relief.

## V.    ANALYSIS AND DISCUSSION

### A.    Procedurally Defaulted and Otherwise Non-Reviewable Claims

#### 1.    Claims 1 (consolidated with 9 and 17), 2 (consolidated with 11), 3 and 5:  Ineffective Assistance of Counsel

Guartos asserts that his trial lawyer was ineffective for failing to (1) meet with him to discuss

evidence, possible defenses, and other trial-related matters; (2) investigate witnesses and potential

witnesses; (3) investigate possible defenses; and (4) subject the prosecution's case to meaningful

adversarial testing. (ECF No. 1, at 5–6 (Ground One). Guartos does not elaborate upon these claims. [6]

The State asserts that these grounds for relief do not satisfy Rule 2(c) of the Rules Governing §

2254 Cases, which requires a petitioner to "specify all grounds for relief available to the petitioner" and to

"state the facts supporting each ground." The Court agrees that the claims are inadequately pleaded

insofar as the petition does not identify what evidence Guartos's attorney failed to discuss with him, which

witnesses or potential witnesses Guartos's trial attorney should have investigated but did not, which

possible defenses the attorney neglected to consider or in what ways the attorney neglected to prepare

for trial, or in what manner he failed to subject the State's case to meaningful adversarial testing.

In addition, however, review of the state-court record confirms that these claims were not raised

---

[6] Guartos's petition is a bare-bones document, utterly devoid of factual or legal support for his claims. Guartos apparently relies entirely upon the underlying record to support his claims for relief. That Guartos is not a native speaker of English no doubt contributed to his difficulties in presenting his claims in this Court.

in the petitioner's state-court post-conviction proceedings in the same form that they are presented here. To preserve a federal constitutional claim for habeas review, the legal and factual basis of the claim must be "fairly presented" to the state courts so that they have an opportunity to remedy the alleged constitutional violation. *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006). Ordinarily, a federal claim is not "fairly presented" to a state court if that court must read beyond the filings to alert it such a claim. *See Baldwin v. Reese*, 541 U.S. 27, 31–32 (2004); see also *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (per curiam) (for a claim to be exhausted, "[i]t is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made"). These claims were not fully and fairly presented in the state-court proceedings. However, the claims are nonetheless deemed to be exhausted, because there is no longer any procedure available under Tennessee law for Guartos to present additional claims in the Tennessee courts to challenge his conviction and sentence. These claims are now barred from presentation to the state courts by Tennessee's statute of limitations, Tenn. Code Ann. § 40-30-102(a), the "one petition" limitation, Tenn. Code Ann. § 40-30-102(c), and the restrictions imposed upon the filing of motions to reopen, Tenn. Code Ann. § 40-30-117. The claims are therefore procedurally defaulted and, as such, may not be considered on habeas review unless petitioner demonstrates both cause for the procedural default and actual prejudice resulting from the alleged constitutional errors, or alternatively that failure to consider the claims will result in a "fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Alley v. Bell*, 307 F.3d 380, 385–86 (6th Cir. 2002) (citations omitted). The petitioner has not made the requisite showing in this case to permit review of these procedurally defaulted claims. Relief on the basis of these claims is therefore not warranted.

### 2. Claims 8, 10 and 19: Ineffective Assistance of Counsel

In Claim 8, Guartos asserts that he was denied effective assistance of counsel based upon his appellate counsel's alleged failure to "raise any meritorious issues on direct appeal of ineffective assistance of counsel." (ECF No. 1, at 6.) Guartos does not indicate what issues his appellate counsel should have raised that were not raised later in post-conviction proceedings.

In Claim 10, Guartos asserts that he was denied effective assistance because his trial counsel failed to raise a *Brady* claim. Guartos does not identify the State's alleged *Brady* violation or indicate

what information he was entitled to receive but did not.

In Claim 19, Guartos asserts that he was denied effective assistance of counsel based upon his trial counsel's failure to object to alleged prosecutorial misconduct. (ECF No. 1, at 6.) Guartos does not identify what misconduct he is referring to or how he was prejudiced by it.

All of these claims are inadequately pleaded and therefore do not satisfy Rule 2(c) of the Rules Governing § 2254 Cases, which requires a petitioner to "specify all grounds for relief available to the petitioner" and to "state the facts supporting each ground."

Moreover, the petitioner did not fairly present these claims to the Tennessee state courts either on direct appeal or in post-conviction proceedings. As a result, as with the claims discussed above, he is now barred by the post-conviction statute of limitations and restrictions on successive state petitions from presenting the claims in the state courts now. Tenn. Code Ann. §§ 40-30-102(a), -102(c), and -117. Because the petitioner has never fairly presented the claims to the state courts, and state procedural rules prohibit the state court from extending further consideration to them, the claims are deemed exhausted but procedurally barred from federal review. Guartos has not made the requisite showings to overcome the default and is therefore not entitled to relief on the basis of these claims.

### 3. Claims 20–27: Prosecutorial Misconduct

Guartos claims that the State committed prosecutorial misconduct by (1) forcing or coercing Deborah Sloan, Barbara Franklin, and Stacy Butts to testify "as to what ever the prosecutor wanted them to" against him at trial (ECF No. 1, at 7); (2) by stating during closing argument that the "paper was wrong" (*id.*); (3) by "falsif[ying] statements and documents on phone records dated 3/17/99" (*id.*); (4) by withholding audiotapes of an interview with Eugene Nagele; (5) by failing to disclose portions of witness statements; (6) by withholding police reports and witness statements concerning the petitioner's March 15, 2000 interview with detectives; (7) by introducing in-court and out-of-court identification by Debbie Sloan and in-court identification by Stacy Butts; and (8) by discarding notes from Detective Norris Tarkington.

Guartos either did not raise these claims at all in his state proceedings, or he raised them under a different theory, such as a theory that he was deprived of due process by the State's misconduct. Consequently, the claims were not fully and fairly presented in the state-court proceedings. The claims

are nonetheless deemed to have been exhausted but procedurally defaulted from federal review, because there is no longer any procedure available under Tennessee law that would permit Guartos to present additional claims in the Tennessee courts to challenge his conviction and sentence. Tenn. Code Ann. §§ 40-30-102(a), -102(c), and -117. Guartos has not made the requisite showings to overcome the default and is therefore not entitled to relief on the basis of these claims.

### 4. Claims 28, 29, and 47: Challenge to Admission at Trial of Guartos's Statements to Police

Under "Ground Three" in his petition, Guartos asserts that "various statements made to law enforcement agents in the wake of [Guartos's] arrest" were inadmissible because the State failed to carry its burden of showing that Guartos's relinquishment of his constitutional rights was voluntary, because the police officers who interviewed him did not read him his *Miranda* rights. Under "Ground Twenty" of his petition, Guartos alleges that the statement taken by the Nashville Police in Miami, Florida "was unlawful, being given in violation of Petitioner Guartos' Fifth (5th), Sixth (6th), and Fourteenth (14th) Amendment rights because Petitioner repeatedly requested to see his attorney." (ECF No. 1, at 14.) The Court finds that these claims were technically exhausted insofar as Guartos claimed in his direct appeal that "the alleged statement taken by the Nashville Police in Miami, Florida was unlawful, being given in violation of Mr. Guartos' Fifth, Sixth and Fourteenth Amendment rights because Mr. Guartos repeatedly requested to see his attorney." (ECF No. 33-1, at 9.) Guartos further argued in his direct appeal that the detectives never gave him his *Miranda* rights at any time during the interview, and that his statement was not voluntarily given. Detective Tarkington was not questioned during trial, either on direct or cross examination, about whether he read Guartos his *Miranda* rights, but at the hearing on the motion for a new trial, he conceded that he did not. (Trial Tr. Vol. 6, at 823:15–16 (ECF No. 32-1, at 88).) Guartos's trial attorney did not file a pretrial motion to suppress the statements, nor did he move during trial to suppress the statements.

The Tennessee Court of Criminal Appeals characterized Guartos's challenge to the admission of his pre-arrest statement as concerning whether the statement should have been suppressed during trial, and found that the petitioner had waived consideration of this issue by failing to file a pretrial motion to suppress the statement in accordance with state procedural rules:

> The defendant contends that the inculpatory statements he made to Detectives

> Haney and Tarkington were taken in violation of his Fifth Amendment rights. He claims that when the detectives interrogated him, he was in jail in Miami, Florida; that the detectives did not give him the warnings required by *Miranda v. Arizona . . .* , and that although he asked for his lawyer before the conversation began, the detectives continued to interrogate him without his lawyer present. The state contends the defendant has waived this issue for failing to file a pretrial motion to suppress his confession. We agree with the state.
>
> Pursuant to Rule 12(b)(3) of the Tennessee Rules of Criminal Procedure, motions to suppress evidence must be raised "prior to trial." *See State v. Davidson*, 606 S.W.2d 293, 295–96 (Tenn. Ct. Crim. App. 1980); *Feagins v. State*, 596 S.W.2d 108, 109–10 (Tenn. Ct. Crim. App. 1979). The failure to present a motion to suppress by the time set by the trial court constitutes waiver, but the trial court may grant relief from the waiver for "cause shown." Tenn. R. Crim. P. 12(f). The record reflects that the defendant did not file a motion to suppress the statements he made in Miami, Florida, to Detectives Haney and Tarkington. He has accordingly waived this issue.

*Guartos*, 2006 WL 163633, at *32.

The procedural default doctrine serves to bar review of a federal claim that the state court declined to address because the petitioner did not comply with a state procedural requirement. *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977). In such a case, "the state judgment rests on independent and adequate state procedural grounds." *Coleman*, 501 U.S. at 730. The Sixth Circuit has established a four-pronged analysis to determine whether a claim has been procedurally defaulted on this basis, pursuant to which a reviewing court must decide: (1) whether the petitioner failed to comply with an applicable state procedural rule; (2) whether the state court actually enforced the state procedural sanction; (3) whether the state procedural bar is an "adequate and independent" state ground on which the state can foreclose federal review; and (4) if the above are met, whether the petitioner has demonstrated "cause" and "prejudice." *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986).

Under the first *Maupin* prong, there must be a firmly established state procedural rule applicable to the petitioner's claim and the petitioner must not have complied with the rule. *See Ford v. Georgia*, 498 U.S. 411, 423–24 (1991) (state procedural bar that is not "firmly established and regularly followed" cannot serve to bar federal judicial review); *Franklin v. Anderson*, 434 F.3d 412, 418 (6th Cir. 2006). Under the second prong, the last state court to which the petitioner sought review must have invoked the procedural rule as a basis for its decision to reject review of the prisoner's federal claim. *Coleman v. Thompson*, 501 U.S. 722, 729–30 (1991); *Baze v. Parker*, 371 F.3d 310, 320 (6th Cir. 2004) (if a state court does not expressly rely on a procedural deficiency, then a federal court may conduct habeas review). Under the third prong, a state judgment invoking the procedural bar must rest on a state law

ground that is both independent of the merits of the federal claim and is an adequate basis for the state court's decision. *Munson v. Kapture*, 384 F.3d 310, 313–14 (6th Cir. 2004). Finally, under the fourth prong, a claim that is procedurally defaulted in state court will not be reviewable in federal habeas corpus unless the petitioner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or that failure to consider the claim will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 751. The "cause" factor requires the petitioner to show "some objective factor external to the defense [that] impeded [the defense's] efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Examples include "a showing that the factual or legal basis for a claim was not reasonably available" previously, or "some interference by officials." *Id.* (citation omitted). Regarding the "prejudice" factor, "[t]he habeas petitioner must show not merely that the errors at trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Id.* at 494 (emphasis in original) (alterations, citation, and internal quotation marks omitted).

In the present case, it is clear that the petitioner's counsel failed to file a pretrial motion to suppress the challenged statements, as required by Rule 12(b) of the Tennessee Rules of Criminal Procedure, and that Rule 12(f) provides that failure to file a pretrial motion to suppress constitutes a waiver of the objection, in the absence of a showing of "good cause" for the failure. The Tennessee Court of Criminal Appeals specifically cited to the applicable rules and concluded that a waiver under Rule 12(f) had occurred. As a result of the waiver, the court did not reach the merits of the petitioner's argument. This Court's review of Tennessee cases confirms that the Tennessee procedural rules relied on by the Court of Criminal Appeals in Guartos's case, Rules 12(b) and 12(f) of the Tennessee Rules of Criminal Procedure, are firmly established and regularly followed. *See, e.g.*, *State v. Gagne*, No. E2009–02412–CCA–R3–CD, 2011 WL 2135105 (Tenn. Ct. Crim. App. May 31, 2011) (finding the defendant had waived the issue of the admissibility of a blood toxicology report for failing to file a pretrial motion to suppress); *State v. Foote*, 631 S.W.2d 470, 473 (Tenn. Ct. Crim. App. 1983) (finding that a motion to suppress raised on day two of trial was not timely and resulted in waiver of the issue). The state court did not address the issue of good cause, but it does not appear that Guartos's appellate counsel argued that there was good cause for trial counsel's failure to have raised this issue before trial. Further, Guartos's

appellate counsel deliberately chose not to raise ineffective-assistance claims at the motion for a new trial or on direct appeal.  (*See* ECF No. 33-1, at 217–22.)

The state court's application of the rules therefore constitutes an "adequate and independent" state ground for refusing to consider the merits of the claim, for purposes of foreclosing federal review. The claim is therefore procedurally defaulted, and the petitioner has not attempted to show cause, in the form of "some objective factor," *Murray*, 477 U.S. at 488, for the  failure to comply with the State's procedural rule.  Even if the petitioner could show that his attorney's ineffective assistance constituted adequate cause, he cannot show that he was prejudiced by the failure, since the record establishes that even if the attorney had filed such a motion, it would not have been granted.

The Court therefore concludes that this claim is not reviewable by this Court.

### 5.      Claim 32:  Actual Innocence

Guartos asserts, passionately, that he is "actually innocent" of the crimes for which he was convicted.  This claim was not raised in the state court proceedings and is therefore procedurally defaulted.  Moreover, Guartos has not presented any new evidence of innocence, and his bare assertion of actual innocence is insufficient to overcome the procedural default.

Even if Guartos were able to point to new evidence establishing innocence, such evidence, standing alone, would not be sufficient to show that he is entitled to habeas relief.  A writ of habeas corpus may be granted "only on the ground that [the petitioner] is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  Thus, the existence of new evidence, standing alone, is not a basis for granting the writ.  As the Supreme Court has explained: "Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding."  *Herrera v. Collins*, 506 U.S. 390, 400 (1993); *see also id.* at 404 (claim of actual innocence is "not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise [procedurally] barred constitutional claim considered on the merits."); *Schlup v. Delo*, 513 U.S. 298, 314–16 (1995) (distinguishing *Herrera* because the petitioner "accompanie[d] his claim of innocence with an assertion of constitutional error at trial"); *Townsend v. Sain*, 372 U.S. 293, 317 (1963) ("Of course, such evidence must bear upon the constitutionality of the

applicant's detention; the existence merely of newly discovered evidence relevant to the guilt of a state prisoner is not a ground for relief on federal habeas corpus."), *overruled in part on other grounds, Keeney v. Tamayo–Reyes*, 504 U.S. 1 (1992).

In *Schlup*, the Supreme Court elaborated on the showing required to establish "actual innocence" for purposes of overcoming a procedural bar to consideration of a constitutional claim.  The Court explained that, to establish actual innocence, the petitioner must "show that a constitutional violation has probably resulted in the conviction of one who is actually innocent.  To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence."  *Schlup*, 513 U.S. at 327 (internal citation and quotation omitted).  The petitioner here does not point to any new, reliable evidence that he is actually innocent.  Rather, the petitioner points to his own account of events.  The petitioner's own testimony is not new because it was known to him at the time of trial, and the petitioner actually testified at trial.  Moreover, his testimony does not constitute the type of reliable evidence necessary to show actual innocence.  Accordingly, the Court concludes that the petitioner is not entitled to habeas relief on this claim.

### 6.    Claim 34:  Denial of Due Process Based on the Use of Outdated Photograph Instead of Contemporaneous Mug Shot

Guartos asserts that he was denied due process by the State's identification procedures, insofar as the state improperly used an outdated photograph instead of a contemporaneous photograph that was available from a mug shot taken just two weeks before the offenses of conviction were committed. Guartos raised this claim in his direct appeal, but the Tennessee Court of Criminal Appeals denied relief on the grounds Guartos had waived the claim by failing to file a pretrial motion to suppress:

> The defendant contends that the state's photograph identification procedures violated his right to due process of law.  He claims that the state improperly used an outdated photograph of him when a more current photograph was available and that the state's identification procedures were impermissibly suggestive.  The state contends the defendant has waived this issue by failing to file a pre-trial motion to suppress.  We agree with the state.

> The Tennessee Rules of Criminal Procedure mandate that certain motions be raised before trial, including motions to suppress evidence.  See Tenn. R. Crim. P. 12(b)(3) [now Rule 12(b)(2)].  Failure to raise such a motion constitutes waiver on appeal. See Tenn. R. Crim. P. 12(f).  We conclude that the defendant has waived these issues.

*Guartos*, 2006 WL 163633, at *20–21.  As discussed at length above (Part V.A.4), waiver, through the application of Rules 12(b) and 12(f) of the Tennessee Rules of Criminal Procedure, supplies an adequate

and independent state law ground for denial of relief which will bar habeas review, unless the petitioner demonstrates both cause for failure to raise the claim at the appropriate time and prejudice. *Cone v. Bell*, 492 F.3d 743, 758 (2007). Guartos here has not shown cause or prejudice. This claim is therefore procedurally defaulted and barred from habeas review.

### 7.     Claim 37:  Denial of Due Process Based on Suggestive Line-Up Procedures

Guartos states in his petition that he "was denied due process in violation of the Fourteenth Amendment to the United States Constitution by the suggestive and incorrect lineup procedures conducted by Detective Tarkington." (ECF No. 1, at 13.)

To the extent the petitioner seeks to challenge the Deborah Sloan's in-court identification of him, that issue is addressed elsewhere in this opinion. (*See* Part V.B.11 (Claim 38).) Insofar as the petitioner challenges the use of an outdated photograph of the petitioner in the photographic line-up used by the police officers, that issue has already been addressed. (*See* Part V.A.6 (Claim 34).)

If the petitioner intends to challenge some other aspect of the line-up procedures used by the police, the issue is waived based on the petitioner's failure to raise such a claim during the state-court proceedings. And finally, as the State argues, Guartos's pleading is insufficient under Habeas Rule 2(c), which requires a petitioner to specify all the grounds for relief available to the petitioner and the "facts supporting each ground." Guartos's very general allegation fails to provide sufficient specificity to enable the Court to address this claim. For all these reasons, Guartos is not entitled to relief as to this claim.

### 8.     Claims 44 and 45:  The In-Court Identifications by Franklin and Butts

Guartos claims that he was denied due process by the in-court identifications by witnesses Barbara Franklin and Stacey Butts. He raised this claim in his direct appeal, where he argued that because neither of these witnesses participated in a pretrial photographic line-up identification, and both described him in their pretrial statements inconsistently with his actual appearance at the time of the robbery, the in-court identifications were wholly unreliable and made under highly suggestive circumstances that denied the petitioner of his right to due process.

The state appellate court rejected his argument with respect to both witnesses:

> With regard to the defendant's contention that Ms. Franklin's in-court identification violated due process because she had failed to identify him previously, we note that Ms. Franklin admitted on cross-examination that she had never before viewed a photograph array of the defendant. She also admitted the police had not asked her to

identify the defendant before the trial. The record reflects that the defendant failed to take any action available to him at the time to prevent this issue regarding Ms. Franklin's testimony. Accordingly, he has waived this issue.

With regard to the defendant's contention that Ms. Franklin's testimony amounts to a due process violation because it was inconsistent with the testimony of other witnesses for the state, the defendant is again asking this court to make a credibility determination. The defendant is not entitled to relief on this issue.

. . . .

With regard to the defendant's contention that Ms. Butts' in-court identification violated due process because she had failed to previously identify him, we note that Ms. Butts testified directly after Ms. Franklin; yet, the defendant elected not to ask Ms. Butts whether she had previously picked the defendant out of a photograph array. We also note the defendant failed to move to strike Ms. Butts' testimony or to ask for a mistrial based upon a due process violation. The record reflects that the defendant failed to take any action available to him at the time to prevent or nullify the effect of Ms. Butts' testimony. Accordingly, he has waived this issue.

*Guartos*, 2006 WL 163633, at *23, *24 (citing Tenn. R. App. P. 36(a); other internal citations omitted).

As discussed above, waiver supplies an adequate and independent state law ground for denial of relief which will bar habeas review, unless the petitioner demonstrates cause for failure to raise the claim at the appropriate time and prejudice. *Cone v. Bell*, 492 F.3d 743, 758 (2007). Guartos here has not shown either cause or prejudice. The due-process claims based on the in-court identifications are therefore procedurally defaulted and barred from habeas review.

**9.      Claim 46:  The Court Reporter's Failure to Transcribe the State's Closing Argument**

Guartos insists that he was denied due process and equal protection by the court reporter's failure to transcribe the State's closing argument. He raised this argument on direct review, asserting that reversal and remand for a new trial were required because the court could not fully review all of the issues because of the absence of a complete transcript. The State pointed out in its response that the petitioner had not objected to any portion of the State's closing argument, and therefore could not show that his due process rights were violated by the court reporter's failure to transcribe the closing argument.

In reviewing this issue, the Tennessee Court of Criminal Appeals held that:

The Tennessee Rules of Appellate Procedure provide that if a "stenographic report, substantially verbatim recital or transcript of the evidence or proceedings" is not available, a defendant "shall prepare a statement of the evidence . . . from the best available means, including the appellant's recollection" and include it in the appellate record. [Tenn. R. App. P.] 24(c). The defendant has failed to prepare a statement of the evidence of the state's closing argument and include it in the appellate record and has not shown that such preparation could not have occurred. We conclude that he has waived this issue. See [Tenn. R. App. P.] 36(a).

*Guartos*, 2006 WL 163633, at * 32.

This Court concludes that the petitioner's failure to comply with a state procedural rule, which the state court relied upon to deny relief, supplies an adequate and independent state law ground for denial of relief which will bar habeas review, unless the petitioner demonstrates cause for failure to raise the claim at the appropriate time and prejudice. *Cone v. Bell*, 492 F.3d 743, 758 (2007). Guartos here has not shown either cause or prejudice. Specifically with respect to prejudice, Guartos has never identified any portion of the untranscribed closing argument to which he objects, or which he claims mischaracterized the evidence or otherwise was improper. The due-process claim based on the court reporter's failure to transcribe the State's closing argument is therefore procedurally defaulted and barred from habeas review.

### 10. Claim 55: Denial of Due Process Based on Misleading Characterization of Telephone Records

Guartos argues that he was denied due process by the prosecution's misleading characterization of certain telephone records as reflecting that the calls listed in the records took place on March 17, 1999, when, in fact, they took place on March 16, 1999. (ECF No. 1, at 15.) Although Guartos raised the issue on direct appeal, the Tennessee Court of Criminal Appeals found that he had waived consideration of the issue by failing to object to the introduction of the evidence at the trial. The court found that such failure constituted waiver of the issue. Tenn. R. App. P. 36(a).

This Court's review of the record confirms that the petitioner failed to object to the state's introduction of the telephone records as exhibits, and failed to object to any purported mischaracterization of those records by the state. The state court's finding that he waived the issue was therefore factually supported by the record. As discussed at length above, waiver supplies an adequate and independent state law ground for denial of relief which will bar habeas review, unless the petitioner demonstrates cause for failure to raise the claim at the appropriate time and prejudice. *Cone v. Bell*, 492 F.3d 743, 758 (2007). Guartos here has not shown either cause or prejudice. This claim is therefore procedurally defaulted and barred from habeas review.

### 11. Claim 56: The State Court's Erroneous Admission of Hearsay Evidence

Guartos asserts that the state court erred in admitting hearsay evidence in the form of police

reports disclosing Guartos's home address and telephone number.  On its face, however, Guartos's challenge to the state court's erroneous admission of hearsay evidence does not state a claim based upon a "violation of the Constitution or laws or treaties of the United States," 28 U.S.C. § 2254(a), and therefore does not state a claim upon which habeas corpus relief can be granted.[7]

**B.**    **Fully Exhausted Claims**

*1.*    *Claims 4 and 6:  Ineffective Assistance of Counsel, Failure to Investigate and Prepare for Trial*

In claims 4 and 6, Guartos asserts very generally that his trial counsel was ineffective for failing to properly investigate and prepare for trial.  Guartos's post-conviction counsel raised on appeal, as "Claim I," a general ineffective-assistance claim based on trial counsel's alleged "failure to adequately investigate the facts of the case" (ECF No. 35-4, at 6), under which heading he included his trial counsel's failures to (1) obtain Guartos's Miami mug shot and other photographs contemporaneous with the criminal offense, (2) secure the newspaper article that included information that Debbie Sloan had "crouched down" in her vehicle when she heard the gun shot behind her or obtain the information that Sloan's vehicle windows were tinted, (3) secure the complete recording of Sloan's 9-1-1 call, (4) locate all of Eugene Nagele's recorded statements, (5) obtain police reports discussing Detective Tarkington's photographic identification procedures, (6) play recordings of witness statements for Guartos, (7) obtain Dade County Police Department movement records, (8) discover Detective Tarkington's and Detective Haney's handwritten notes, (9) discover Guartos's post-arrest statement, and (10) discover Detective Haney's police report.  (ECF No. 35-4, at 27–44.)

In addressing these claims, some of which are duplicative of other claims discussed individually in this opinion, the Tennessee Court of Criminal Appeals articulated and discussed at some length the standard for proving ineffective assistance of counsel, as established by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984).  In *Strickland*, the Supreme Court held that in order to successfully claim that a lawyer's assistance was so ineffective as to violate the Sixth Amendment a defendant must

---

[7]  The petitioner raised this claim in his direct appeal, and framed the claim in that context too as a violation of state evidentiary rules.  The state appellate court, in reviewing the claim, agreed with the petitioner that the trial court had erroneously admitted hearsay evidence in the form of a police officer's notes, which he transcribed from his police report based upon the statements of the petitioner's wife.  The court did not find, however, that "the error more probably than not affected the judgment" based on all the other evidence presented at trial, and therefore concluded that the error was harmless, citing Tenn. R. Crim. P. 52(a) and Tenn. R. App. P. 36(b). *Guartos*, 2006 WL 163633, at *33.

meet two requirements. "First, the defendant must show that counsel's performance was deficient." *Id.* at 687. "Second, the defendant must show that the deficient performance prejudiced the defense." *Id.* As discussed above, however, federal habeas relief may not be granted under 28 U.S.C. § 2254 unless the petitioner shows that the earlier state court's decision "was contrary to" federal law then clearly established in the holdings of the United States Supreme Court, § 2254(d)(1); *Williams v. Taylor*, 529 U.S. 362, 412 (2000); or that it "involved an unreasonable application of" such law, § 2254(d)(1); or that it "was based on an unreasonable determination of the facts" in light of the record before the state court, § 2254(d)(2).

Thus, when a claim of ineffective assistance of counsel is raised in a federal habeas petition, the question to be resolved is *not* whether the petitioner's counsel was ineffective. Rather, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Harrington v. Richter*, --- U.S. ----, 131 S. Ct. 770, 785 (2011). As the Supreme Court clarified in *Harrington*,

> This is different from asking whether defense counsel's performance fell below *Strickland*'s standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

*Harrington*, 131 S. Ct. at 786 (internal quotation marks and citation omitted).

The state court, with regard to the petitioner's ineffective-assistance claims, correctly articulated the standard established by *Strickland*, and its application of that standard was not unreasonable. In examining Guartos's trial counsel's conduct, the court also specifically identified an attorney's duty to conduct appropriate investigations:

> Counsel must conduct appropriate investigations, both factual and legal, to determine what matters of defense can be developed. The Supreme Court has noted that the adversary system requires that 'all available defenses are raised' so that the government is put to its proof. This means that in most cases a defense attorney, or his agent, should interview not only his own witnesses but also those that the government intends to call, when they are accessible. The investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities. And, of course, the duty to investigate also requires adequate legal research.

*Guartos*, 2011 WL 2682184, at *20 (quoting *State v. Burns*, 6 S.W.3d 453, 462 (Tenn. 1999) (quoting

*United States v. DeCoster*, 487 F.2d 1197, 1203–04 (D.C. Cir.1973))).

Having articulated that appropriate standards, the court of criminal appeals addressed each of the petitioner's failure-to-investigate claims in some detail and concluded that the petitioner had failed to prove ineffective assistance of counsel in connection with any of them. This Court has examined the state court's rulings on all these issues and concludes that, even if these claims had been properly raised in the present petition, the petitioner has not shown the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law," or that it "was based on an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d). Accordingly, Guartos is not entitled to relief on the basis of these claims.

**2.     Claims 7 and 16:  Ineffective Assistance of Counsel, Failure to File Motion to Suppress**

In claim 7, the petitioner asserts that he was denied the effective assistance of counsel based upon his trial attorney's failure to file a motion to suppress, and in claim 16, he asserts that his counsel was ineffective for failing to file a motion to suppress the statements made by Guartos when he was interviewed by Metro Nashville detectives while he was in jail in Miami, Florida.[8] This claim was raised in the petitioner's state post-conviction proceedings and considered on appeal by the Tennessee Court of Criminal Appeals, and is therefore properly exhausted.

As stated above, that Tennessee Court of Criminal Appeals properly articulated the operative federal standard for governing ineffective-assistance claims, and it then considered this claim, among the other ineffective-assistance claims, in light of that standard. The court noted that petitioner's trial counsel testified that he did not file a motion to suppress any statements to the police because, when he discussed the issue with Guartos, the petitioner maintained that he had not made any incriminating statements, and also never indicated that he had asserted the right to counsel during the interview and been denied that right. Trial counsel therefore did not believe that he had any legal basis (or reason) to file a suppression motion. As a strategic matter, he elected to try to impeach the detectives' testimony

---

[8] As noted above, the State construes claim 16 as asserting that Guartos was denied effective assistance of counsel by his trial counsel's failure to interview an unidentified Florida detective. (ECF No. 29, at 35, ¶ 16.) The Court finds no basis in Guartos's petition for this interpretation. Regardless, to the extent Guartos did intend to raise a claim based on his trial counsel's failure to interview an unidentified Florida detective, such a claim fails because it is not pleaded with the specificity required by Rule 2 and, because it was not raised in the state court proceedings, it is procedurally defaulted at this point.

instead of filing a motion to suppress. *Guartos*, 2011 WL 2682184, at *16. As a factual matter, the post-conviction court found the attorney's testimony to be credible and held that the petitioner had not established by clear and convincing evidence that his counsel was ineffective for failing to file a motion to suppress statements. *Id.* at *31.

Again, the question before this Court is whether the state court applied the appropriate federal constitutional standard and whether its application of that standard was reasonable. The petitioner has not shown the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law," or that it "was based on an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d). He is not entitled to relief on the basis of this claim.

### 3. Claim 12: Ineffective Assistance of Counsel, Failure to Investigate Witness Identifications

Guartos asserts that he was denied effective assistance of counsel based upon trial counsel's alleged failure to investigate witness identification. (ECF No. 1, at 6.) Guartos's pleading of this claim is insufficient under Habeas Rule 2(c), which requires a petitioner to specify all the grounds for relief available to the petitioner and the "facts supporting each ground." For this reason alone, Guartos is not entitled to relief on the basis of claim 12.

Even if Court construes the claim broadly to encompass a claim that trial counsel was ineffective for failing to discover police reports discussing the photographic line-up procedures used with the witnesses in this case, an issue that was raised in post-conviction proceedings, the state court's adjudication of the issue is not contrary to nor an unreasonable application of clearly established federal law. Guartos raised this claim in his appeal from the denial of post-conviction relief, and the Tennessee Court of Criminal Appeals correctly identified *Strickland v. Washington*, 466 U.S. 668 (1984), as establishing the governing standard, and correctly articulated and applied that standard. The court noted that the petitioner had failed to elicit any testimony at the hearing on his motion for a new trial regarding the issue of whether his counsel had been ineffective for failing to discover police reports discussing the photographic line-up procedures used with the witnesses in this case. The trial court deemed the issue waived because the petitioner had not provided proof that his counsel was ineffective or that he was prejudiced by counsel's failures. The appellate court found that the evidence did not preponderate against the post-conviction court's findings in that regard, observing:

At the hearing for the motion [for] a new trial, the Petitioner attacked the photographic identification procedures used by police as a violation of his right to due process of law. This is a different legal argument than that of ineffective assistance of counsel. During the post-conviction hearing, the transcript from the motion for new trial was introduced as part of the record[;] however, not one witness testified specifically as to how Counsel was ineffective for failing to note the detective's error as to dates on his reports or how that omission by Counsel prejudiced the Petitioner. Therefore, the trial court did not err in finding that the Petitioner failed to show by clear and convincing evidence that Counsel was ineffective and any resulting prejudice. The Petitioner is not entitled to relief on this issue.

*Guartos*, 2011 WL 2682184, at *24.

Guartos has failed to demonstrate that the state court's adjudication of this claim involved an unreasonable application of clearly established federal law or was based upon an unreasonable determination of the facts in light of the evidence before the state court. He is therefore not entitled to habeas relief on the basis of this claim.

### 4. Claims 13 and 15: Ineffective Assistance of Counsel, Failure to Investigate Recorded Statements and Tape Recordings

Guartos contends that he was denied effective assistance of counsel based upon his trial counsel's alleged "failure to investigate . . . recorded statements, . . . tape recordings." (ECF No. 1, at 6.) Again, his pleading is insufficient under Habeas Rule 2(c), which requires a petitioner to specify all the grounds for relief available to the petitioner and the "facts supporting each ground." Guartos's very general allegations fail to provide satisfy that standard insofar as he does not specify which recorded statements or tape recordings his counsel should have investigated.

To the extent Guartos's challenge can be read to encompass a claim that trial counsel was ineffective for failing to discover all the recorded statements of Eugene Nagele, Christina Hudson, and Barbara Franklin, claims that Guartos did raise in post-conviction proceedings, this Court finds that the state court's adjudication of these claims is not contrary to or an unreasonable application of clearly established federal law. In considering these claims, Court of Criminal Appeals correctly identified *Strickland v. Washington*, 466 U.S. 668 (1984), as the source of the governing legal standard, and its application of that standard did not involve an unreasonable application of clearly established federal law nor was it based upon an unreasonable determination of the facts in light of the evidence.

The Court of Criminal Appeals reviewed the evidence, and appropriately determined that the evidence did not support the petitioner's claims. Specifically with respect to the issue of the recording of

police detectives' second interview with Eugene Nagele, Guartos's counsel raised this claim as a *Brady* issue at the motion for a new trial. The trial court agreed that it was error for the State not to have provided the recording to Guartos, but also found that there were no material inconsistencies between the first and second recordings. Thus, although the trial court found that the State had violated discovery rules in failing to produce the recording, it also found that Guartos had not established that he was prejudiced as a result. The court also found that Guartos could not establish that his counsel was ineffective for failing to obtain this recording from the police because "even the State was unaware that this interview was not contained within the case materials." *Guartos*, 2011 WL 2682184, at *23. The appellate court confirmed on the basis that Guartos had failed to show that he was prejudiced by any purported failure on the part of his counsel, noting in particular that Guartos did not point to any evidence in the second statement that was not also included in the first, and that any discrepancies between Nagele's and Sloan's testimony was resolved by the jury. *Id.*

As for the recorded police interviews with Christina Hudson and Barbara Franklin, Guartos has never alleged that his counsel was ineffective for failing to discover these recordings, but rather for failing to play them for Guartos prior to trial. The post-conviction court addressed this issue, and noted that Guartos's counsel testified that he had listened to the recordings but that he had been unable to get a recording system into the facility in which the petitioner was incarcerated in order to be able to play them for him. The state court observed that this was not an unusual situation, and further found that Guartos's counsel stated that he himself was familiar with the contents of the interviews, that he discussed the interviews with his client, and that he prepared his cross-examinations of the witnesses accordingly. The court found that the petitioner therefore could not establish that he was prejudiced by his counsel's alleged failure to play them for the petitioner personally. The appellate court held that the evidence did not preponderate against the post-conviction court's findings.

Guartos is not entitled to habeas relief on the basis of these claims.

**5.      *Claim 14:   Ineffective Assistance of Counsel, Failure to Investigate Telephone Records***

The petitioner does not specifically identify which telephone recordings his attorney should have but failed to investigate or how he was prejudiced thereby. HIs pleading is therefore insufficient under Habeas Rule 2(c), which requires a petitioner to specify all the grounds for relief available to the petitioner

and the "facts supporting each ground." Even if that were not the case, it does not appear that Guartos fairly presented this claim to the Tennessee state courts either on direct appeal or in post-conviction proceedings in the form of an ineffective-assistance claim. In his direct appeal, Guartos argued that he was denied due process by the State's misleading characterization of some telephone records that were introduced into evidence. He claimed the State had represented that certain calls were placed from the Green Hills Mall on March 17, when they were actually placed on March 16. The state court concluded that Guartos had waived this issue by failing to object to the evidence during trial. Guartos then raised this issue in the form of an ineffective-assistance claim in his post-conviction proceedings, but framed the issue in terms of his counsel's failure to object to the introduction of the telephone records as misleading. *See Guartos*, 2011 WL 2682184, at *32. In other words, the claims raised in the state courts concerning the telephone records were not based on his trial counsel's alleged failure to investigate the records. On that basis, it appears this claim is procedurally defaulted and barred from habeas review.

Regardless, to the extent Guartos's claim can be construed as co-extensive with the claim raised in his post-conviction appeal, in its review of the denial of Guartos's petition for post-conviction relief, the Tennessee Court of Criminal Appeals articulated the correct federal standard for considering ineffective-assistance claims. Guartos has failed to show that the state court's application of that standard to this issue involved an unreasonable application of clearly established federal law or was based upon an unreasonable determination of the facts in light of the evidence before the state court. He is therefore not entitled to habeas relief on the basis of this claim.

### 6. Claim 18: Ineffective Assistance of Counsel, Failure to Challenge or Investigate the Testimony of the "woman who supposedly witnessed the burglary and murder"

Under Ground One in his petition, Guartos states, somewhat vaguely, that he received ineffective assistance of counsel insofar as his trial counsel

> failed to investigate potential witness(s). . . . Including testimony of the woman who supposedly witnessed the burglary and murder. In light of the evidence presented at trial, Petitioner demonstrates that the results of the proceeding would have been different but for counsel's alleged deficient performance in . . . failing to challenge the validity of the testimony of the women.

(ECF No. 1, at 6.) This claim too is inadequately pleaded under Habeas Rule 2(c), which requires a petitioner to specify all the grounds for relief available to the petitioner and the "facts supporting each ground." Assuming the "woman" to whom the petitioner intends to refer is Debbie Sloan, the claim is still

insufficiently pleaded insofar as the petitioner has not identified in what way his counsel's conduct was deficient or how the petitioner was prejudiced thereby.

Insofar as the claim may be construed as a challenge to trial counsel's failure to move to suppress Debbie Sloan's out-of-court identifications or in-court identification, and his failure to effectively impeach her testimony in general, Guartos raised these claims in his post-conviction proceedings. In denying them, the state appellate court first correctly articulated the standard governing ineffective-assistance claims, and determined that (1) to the extent Sloan's in-court testimony was inconsistent with Eugene Nagele's, this inconsistency raised a witness-credibility problem that was resolved by the jury; (2) the petitioner did not show how Sloan's in-court identification of Guartos involved prosecutorial misconduct and, because there was no misconduct by the State, counsel was not ineffective for failing to raise that issue; (3) to the extent Sloan's testimony at Guartos's trial was inconsistent with the testimony she gave in Guartos's co-defendants' subsequent trial, the petitioner did not explain how his trial counsel could have raised a challenge based on Sloan's testimony at a later trial.

Although it is clear to the Court that Guartos's trial attorney's representation of Guartos was less than stellar, particularly in the area of the cross-examination of Sloan and other witnesses, Guartos has not shown that the state courts' resolution of this issue involved an unreasonable application of clearly established federal law or was based upon an unreasonable determination of the facts in light of the evidence before the state court. He is therefore not entitled to habeas relief on the basis of this claim.

### 7. The Cumulative Effect of Counsel's Errors

Very broadly construed, the petition states a claim based on the cumulative effect of counsel's errors. This claim was raised on direct appeal, and the Tennessee Court of Criminal Appeals, having found no error by counsel, denied relief on this claim as well.

This Court frankly believes that Guartos's trial counsel lacked diligence in his investigation and failed to conduct a thorough cross-examination of the witnesses whose credibility could have been impeached through the use of their pretrial statements or otherwise. The Court further finds that post-conviction counsel failed to raise all the ineffective-assistance claims that might have been raised, and also failed to frame them persuasively. That this Court might have resolved the question of ineffective assistance differently, however, does not satisfy the standard for determining whether habeas relief is

warranted. As discussed above, the petitioner is not entitled to relief on the basis of any of the individually raised ineffective-assistance claims. Likewise, this Court cannot find that the state court's resolution of the cumulative-effect claim amounts to a constitutional violation. The petitioner is not entitled to relief on the basis of this claim.

8.    **Claim 30:  Whether Debbie Sloan's In-Court Identification Violated Guartos's Right to Due Process**

Guartos claims that Debbie Sloan's identification of him at trial violated due process because it was the product of allegedly suggestive identification procedures.

The petitioner raised claims relating to Sloan's in-court identification on direct appeal of his convictions and sentence in the Tennessee Court of Criminal Appeals. There, Guartos's appellate counsel argued that Sloan's identification was "contaminated" by the prosecutor's pointing out Guartos to Sloan before trial began. (ECF No. 33-1, at 191 (Petitioner's App. Brief at 170–76).)  In his appeal, Guartos argued that the prosecutor's act of pointing out the defendant to Sloan was equivalent to a "show-up" identification procedure (ECF No. 33-1, at 196), which, although not a *per se* violation of due process, in this case was inherently suggestive and violated Guartos's due process rights insofar as Guartos was "the victim of State sanctioned, one-on-one identification procedures right in the courtroom when his lawyer was not aware that Ms. Sloan would make an identification of Mr. Guartos."  (ECF No. 33-1, at 197.)

In addressing this argument, the Tennessee Court of Criminal Appeals stated:

The defendant attempts to equate the state's pointing out the defendant to Ms. Sloan and telling Ms. Sloan that fingerprint evidence would be presented at the trial with a "show up" identification, which occurs when the police bring a lone suspect to a witness and ask the witness to identify the suspect. He cites *United States v. Kaylor*, 491 F.2d 1127 (2nd Cir. 1973), and *Neil v. Biggers*, 409 U.S. 188, 93 S. Ct. 374 (1972), for the proposition that a "show up" identification can violate due process in certain circumstances. He claims that in his case, the witness' in-court identification of him that was impermissibly suggested by the state was tantamount to a "show up" identification. We conclude that the state's actions do not offend due process. We note that unlike the myriad cases cited by the defendant, Ms. Sloan had already identified the defendant when she picked his picture out of the photograph array shown to her by Officer Tarkington in July 1999, confirming the defendant's identity as one of the robbers. Further, although the state's actions may have been suggestive, we believe they were not impermissibly so. In this regard, we note that when Ms. Sloan took the stand, the defendant was seated at the defense table, charged by the state as one of the robbers. The defendant is not entitled to relief on this issue.

*Guartos*, 2006 WL 163633, at *21. In sum, the court held that there was no prosecutorial misconduct, no

due-process violation, and no prejudice to the defendant in any event.

This Court cannot conclude that the state court's adjudication of this claim involved an unreasonable application of clearly established federal law or was based upon an unreasonable determination of the facts in light of the evidence before the state court. Guartos is therefore not entitled to habeas relief on the basis of this claim.

### 9. Claim 31: Whether the Evidence is Sufficient to Support the Convictions

Guartos next contends that the evidence was not sufficient to support his convictions. He raised this claim on direct appeal. The Tennessee Court of Criminal Appeals found that the petitioner was not entitled to relief, stating as follows:

> [The petitioner] claims the only evidence linking him to the crimes was the eyewitness testimony of Deborah Sloan and his confession. He claims this court should disregard Ms. Sloan's testimony because she originally stated the robbers were "black men" and because of procedural defects surrounding her in-court identification of the defendant. He argues that he confessed to being present at the scene not to participating in the crimes. He therefore argues that the state's evidence was entirely circumstantial and did not eliminate every reasonable hypothesis except the guilt of the defendant. The state contends the evidence was sufficient. We agree with the state.

> Our standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). We do not reweigh the evidence; rather, we presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. Questions about witness credibility were resolved by the jury.

> At the trial, Deborah Sloan testified that she was certain the defendant was one of the robbers. She said he was the man who bent down and retrieved Mr. Nagele's gun. Barbara Franklin and Stacy Butts testified that the defendant was in the Carlyle and Company store on the day before the robbery, asking questions about the Rolex watches. Detectives Haney and Tarkington testified that the defendant confessed to his involvement in the robbery. They said he admitted to planning the robbery and being present at the scene. They said he admitted that he and the other robbers were driving a maroon van and a white van. They said he admitted accepting $40,000 as his share of the stolen Rolex watches. Tiffany Dozier testified that while staying at the Howard Johnson, the defendant, accompanied by Jonathan Londono, came to the front desk on different occasions. Other evidence produced by the state reflected that a maroon van and a white van were at the Howard Johnson motel and left on the morning of March 17, that the defendant's fingerprints were on a telephone book in room 204, that ammunition consistent with the bullet removed from the victim was found in room 204, and that someone placed calls to the defendant's wife in Miami from the Green Hills Mall on March 16, 1999, and from the Howard Johnson motel on various dates.[9] The defendant

---

[9] As noted above (footnote 8), the state appellate court concluded that admission of testimony from a Florida policeman regarding the petitioner's telephone number was hearsay evidence that should have been excluded by the trial court, but that the defendant was not prejudiced by the admission of that

        testified that he was not involved in the robbery and that he did not go to Green Hills Mall while he was in Nashville.  The jury obviously chose to accredit the state's evidence and to reject the testimony of the defendant.  We conclude the evidence was sufficient.  The defendant is not entitled to relief on this issue.

*Guartos*, 2006 WL 163633, at *16–*17 (some internal citations omitted).

The Court of Criminal Appeals cited and relied upon Supreme Court precedent, as established in *Jackson v. Virginia*, and reviewed the relevant evidence and reasonably concluded that the evidence was sufficient to permit a reasonable jury to find that the petitioner was guilty of the crimes he was charged with committing.  The court's decision did not involve an unreasonable application of clearly established federal law.  28 U.S.C. § 2254(d)(1).  Because the petitioner has failed to demonstrate that the state court's adjudication of this claim involved an unreasonable application of clearly established federal law or was based upon an unreasonable determination of the facts in light of the evidence before the state court, he is not entitled to relief on the basis of this claim.

### 10.     *Claims 33, 35, 48, 50, and 52:  Newly Discovered Evidence*

On direct appeal, Guartos argued that the trial court erred in denying him a new trial based on newly discovered evidence consisting of "(1) photographs and a mug shot taken near the time of the offenses, (2) a newspaper article about [Debbie Sloan's] ability to see the defendant, (3) movement sheets from the Dade County Police Department showing the length of time the detectives interrogated the defendant, (4) admissions by the lead detectives at the motion for new trial hearing that they destroyed their handwritten notes taken during the defendant's interview, and (5) the defendant's post-arrest statement."  *Guartos*, 2006 WL 163633, at *17.  Guartos argued that the denial of a new trial on the basis of this evidence violated his due-process rights under the Fourteenth Amendment, and his Sixth Amendment right to a fair trial.  The trial court denied Guartos's motion for a new trial based on this new evidence, and the Tennessee Court of Criminal Appeals affirmed.  Guartos reiterates in his habeas petition his claims that these elements of newly discovered evidence warrant a new trial.

In rejecting the new-evidence claims, the Tennessee Court of Criminal Appeals cited solely to state law, without reference to the petitioner's due-process argument, even though the issues were framed in terms of constitutional violations:

---

evidence, as the remaining evidence was still sufficient to convict him.  *See Guartos*, 2006 WL 163633, at *33.

The decision to grant or deny a new trial on the basis of newly discovered evidence is a matter that rests in the sound discretion of the trial court. *State v. Goswick*, 656 S.W.2d 355, 358 (Tenn. 1983). However, a new trial is a matter of right only when the defendant establishes (1) reasonable diligence in seeking newly discovered evidence, (2) the materiality of the evidence, and (3) that the new evidence is likely to change the result of the trial to one more favorable for the defendant. *State v. Bowers*, 77 S.W.3d 776, 784 (Tenn. Crim. App. 2001) (citing *State v. Singleton*, 853 S.W.2d 490, 496 (Tenn. 1993)). When newly discovered evidence merely tends to contradict or impeach the trial evidence, a new trial is not always warranted. [*State v.*] *Sheffield*, 676 S.W.2d [542,] 544 [(Tenn. 1984)]. On appeal, our standard of review is abuse of discretion. *State v. Meade*, 942 S.W.2d 561, 565 (Tenn. Crim. App. 1996).

*Guartos*, 2006 WL 163633, at *18. In considering each newly-discovered-evidence claim individually, the appellate court found that (1) with respect to the mug shot and contemporaneous photos, the petitioner failed to establish that he was reasonably diligent in seeking evidence of the contemporaneous mug shot prior to trial, particularly since trial counsel (and the petitioner) knew that Guartos had been photographed in connection with his Florida arrest just two weeks before the robbery; (2) the petitioner failed to establish that the newspaper article itself constituted substantive evidence or that it contained information that was materially different from the evidence presented at trial, and therefore did not constitute newly discovered evidence; (3) with respect to the Dade County Jail movement sheets, the petitioner did not prove he was reasonably diligent in seeking to obtain the information; moreover, the impeaching evidence would not have changed the result of the trial; (4) the petitioner failed to request the detectives' handwritten notes during discovery and failed to cross-examine the detectives about the notes during trial when they testified to the existence of the notes; and (5) the State had constructive knowledge about the petitioner's post-arrest statement and should have provided it to the defense, but the statement was favorable to the State and would not have changed the outcome of the trial.

To establish a constitutional due-process claim, Guartos must demonstrate that the trial court's denial of his motion for new trial on the basis of new evidence was "so egregious" that it violated his right to a fundamentally fair trial. *Pudelski v. Wilson*, 576 F.3d 595, 611 (citing *Fleming v. Metrish*, 556 F.3d 520, 535 (6th Cir. 2009); *Baze v. Parker*, 371 F.3d 310, 324 (6th Cir. 2004). The state courts' rulings with respect to the allegedly newly discovered evidence were not so egregious as to meet that standard, because: (1) both Guartos and his counsel knew that Guartos had been previously arrested, so the contemporaneous mug shot was not truly "new" evidence, and Guartos himself knew that his hair was shorter at the time of the robbery than at the time of trial, but he did not inform his attorney of that fact; (2)

Debbie Sloan testified at trial that she was "trying to stay very low" in her vehicle, because she did not want the robbers to see her (Trial Tr. Vol. 2, at 187:1 (ECF No. 31-2, at 53)), so the information in the newspaper article that she was crouched down was not new; and trial counsel had the ability to cross-examine Sloan on her ability to clearly view the events she witnessed; (3) the state courts were not unreasonable in noting that it is common knowledge that all jails keep movement sheets documenting the movement of inmates, and concluding that Guartos's trial counsel could have obtained that information prior to trial if he had sought it; in addition, Guartos himself knew or should have known how long the interview at the Miami jail lasted; and (4) with respect to the detectives' handwritten notes, the detectives testified at trial that they took notes, but trial counsel did not cross-examine them on that topic; the state courts were not unreasonable in concluding that Guartos's counsel did not exercise reasonable diligence in seeking the notes in discovery or cross-examining the detectives about the notes. Guartos also did not show that he was prejudiced by the absence of this "new evidence," since he has not shown that the notes would have been materially different from the typed reports that were created based upon them.

And last, the post-arrest statement that Guartos claims was newly discovered evidence was not favorable to the petitioner. Instead, the report reinforced the police detectives' testimony that Guartos had confessed during their first interview with him in Miami. Its introduction at trial would not have changed the outcome of the trial in the petitioner's favor.

Regardless of whether the evidence to which Guartos refers, if it had been available and admitted at trial, might have changed the result of the trial, the state courts' conclusion that the evidence was not "newly discovered" and that Guartos's counsel did not exercise reasonable diligence in procuring it prior to trial was not unreasonable. In sum, the Court concludes that the trial court's denial of his motion for new trial on the basis of this evidence was not "so egregious" that it violated Guartos's right to a fundamentally fair trial. *Pudelski*, 576 F.3d at 611.

11.     **Claim 36:  Denial of Due Process Based on State's Failure to Disclose that Sloan's Vehicle Had Tinted Windows**

The petitioner contends that he was denied due process by the State's failure to disclose that Debbie Sloan's vehicle had tinted windows. Guartos raised this claim on direct appeal, but the Court of Criminal Appeals appropriately rejected the petitioner's *Brady* claim, explaining:

The defendant asserts that the state's failure to disclose that Ms. Sloan's car

windows were tinted constitutes a *Brady* violation, thereby denying him due process of law. He contends that this knowledge was a "matter uniquely within the knowledge of the state" and highly material. The state asserts the defendant failed to prove that the state knew that Ms. Sloan's windows were tinted or that the tinting affected Ms. Sloan's ability to identify the defendant. It also asserts the defendant did not question Ms. Sloan on the issue when she testified at the hearing on the motion for a new trial.

In order to establish a due process violation under *Brady*, the defendant must demonstrate that the evidence is material. At the motion for a new trial hearing, the defendant asked Ms. Sloan if she had tinted windows in her car but did not ask any further questions about her ability to see through those windows. He also failed to introduce into evidence any expert testimony or empirical evidence for the proposition that tinted windows obscure a person's view from within a car sufficient to call into question the ability of that person to identify someone outside the car. We conclude no reasonable probability exists that the results of the defendant's trial would have changed had the state disclosed this evidence. The defendant has not established the element of materiality, and he is not entitled to relief on this issue.

*Guartos*, 2006 WL 163633, at *26–*27.

The state court relied on the relevant Supreme Court precedent of *Brady v. Maryland*, and its decision did not involve an unreasonable application of clearly established federal law, and it was not based upon an unreasonable determination of the facts in light of the evidence before the state court. 28 U.S.C. § 2254(d)(1). Guartos is not entitled to habeas relief on the basis of this claim.

### 12.    Claim 38 and 39:  Denial of Due Process Based on Debbie Sloan's Inconsistent Testimony and Identifications of the Petitioner

In his habeas petition, Guartos not provide any factual allegations in support of his claims that he was denied due process as a result of Debbie Sloan's inconsistent testimony and by her in-court and out-of-court identifications of the petitioner, but he raised these claims on direct appeal to the Tennessee Court of Criminal Appeals, where he did make specific factual arguments. (*See* ECF No. 33-1, at 192–200.) There, he argued that he was denied due process based on Debbie Sloan's inconsistent testimony and "by the in-court identification of Ms. Sloan and the out-of-court identification of Ms. Sloan," because, during trial, Sloan testified that Guartos and the other robbers were not wearing hoods but Nagele and Rogers said that at least one of the men had a hood on, and during the hearing on the motion for a new trial, Sloan vacillated on the issue of whether the men were wearing hoods. Guartos argued that this inconsistency is important because Sloan was allowed to see Guartos before her in-court identification of him. Guartos argues that these inconsistencies make it apparent that Sloan had no real opportunity to identify Guartos during the robbery, and her identification was further compromised by being shown inaccurate and older mug shots. He demanded a reversal on the basis that these inconsistencies created

a substantial chance of misidentification.

The state appellate court rejected this claim, as follows:

> The defendant contends that Ms. Sloan's trial testimony was inconsistent and contradicted by other witnesses. He illustrates that Ms. Sloan said the robbers were "black men" when they were in fact Hispanic; that the form she signed when picking the defendant out of the photograph array states the defendant "looked familiar," when at the trial she said she was certain the defendant was the robber; and that her testimony concerning whether the defendant was wearing a hood during the robbery was inconsistent with the statement of the victim and Mr. Nagele. He claims this incredible testimony violated his right to due process. The state responds that the defendant has waived this issue for failing to file a pretrial motion to suppress and for failing to object at the trial and that he has failed to establish a due process violation.
>
> Initially, we note the defendant failed to object at the trial to a due process violation based upon Ms. Sloan's testimony, which he contends was inconsistent with her pre-trial statements. Failure to object at the trial constitutes waiver. See [Tenn. R. App. P.] 36(a). However, the defendant's contention is based, in part, upon his discovering an undisclosed statement of Mr. Nagele after the trial. In any event, the defendant is asking this court to make a credibility determination. The credibility of Ms. Sloan's testimony was in the exclusive province of the jury. The defendant is not entitled to relief on this issue.

*Guartos*, 2006 WL 163633, at *22 (internal citation omitted).

The state court's resolution of the issues glosses over the fact that part of the petitioner's due-process claim was based on the State's failure to disclose one of Nagele's two recorded statements. As discussed below, however, the state court addressed that claim elsewhere in its opinion, finding that a discovery violation had occurred, but that the petitioner had not shown that he was prejudiced thereby. *Guartos*, 2006 WL 163633, at *29. The remainder of the petitioner's argument concerned the discrepancies between Sloan's trial and pre-trial testimony, and between her testimony and Nagele's. The state court's determination that these issues were, respectively, (1) waived for failure to object at trial or to move to suppress and (2) resolved by the jury was not contrary to, nor did it involve an unreasonable application of, clearly established federal law. The decision was not based on an "unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d). Relief on the basis of these claims is not warranted either.

### 13. Claim 40: Whether Guartos Is Entitled to a New Trial Based on Kimberly Allison's Pointing Out the Petitioner to Sloan

Guartos asserts that he is entitled to a new trial because witness Kimberly Allison told Debbie Sloan who the petitioner was before trial started. Although he fails to support this claim with any specific argument that this action violated his constitutional rights, he raised this claim on direct appeal. The

Tennessee Court of Criminal Appeals construed the claim as based upon newly discovered evidence and that the alleged identification violated the petitioner's right to due process. Testimony regarding this issue was presented during the hearing on the motion for a new trial, and the trial court rejected the claim. The court of appeals affirmed that decision, stating:

> At the motion for new trial hearing, the defendant's mother testified that she saw Ms. Allison pointing out the defendant to Ms. Sloan. Ms. Allison testified that she did not point out the defendant to Ms. Sloan. The trial court found Ms. Allison's testimony credible, and we conclude the record does not preponderate against the trial court's findings. The defendant is not entitled to relief on this issue.

*Guartos*, 2006 WL 163633, at *22.

The state court's decision was not based upon an unreasonable determination of the facts in light of the evidence. The petitioner is not entitled to relief on the basis of this claim.

### 14. Claim 41: Denial of Due Process Based on the State's Failure to Produce All Statements of Eugene Nagele

On Guartos's direct appeal, the Tennessee Court of Criminal Appeals found as a factual matter that Eugene Nagele had made two statements to the police, both of which were tape-recorded; that the recording of the first statement was made available to the defense; and that the recording of the second statement was not. The State prosecutors were not actually aware of the second recording until after trial. The court found that the State nonetheless had constructive knowledge of the recording, and that the failure to disclose the second recording constituted a violation of Rule 26 of the Tennessee Rules of Civil Procedure.

The court also found, however, that there was no due-process violation with respect to the disclosure of either recording. There was no *Brady* violation with regard to the first recording, because that statement was made available to the defense, and no due-process or *Brady* violation with respect to the second statement because it was consistent with the first recording and not favorable to the defense, and the defendant failed to show prejudice resulting from the State's failure to turn over the statement. *Guartos*, 2006 WL 163633, at *29–*30.

Even now, Guartos has not alleged the existence of material discrepancies between the two recordings or shown how he was prejudiced by his lack of knowledge of the second statement. The state court's decision was not contrary to and did it involve an unreasonable application of clearly established federal law, nor was it based on an "unreasonable determination of the facts in light of the evidence

presented." 28 U.S.C. § 2254(d). Guartos is not entitled to relief on the basis of this claim.

### 15.    Claim 42:    Denial of Due Process Based on State's Failure to Produce Entire Recording of 911 Call

Guartos asserted in his direct appeal that he was denied due process by the State's failure to produce the entire 911 call by witness Deborah Sloan. The state court rejected the claim on the merits, stating:

> The defendant asserts that Ms. Sloan testified that she told the 9-1-1 operator her location, which was not on the tape. Therefore, he asserts that more of the 9-1-1 tape exists than what the state provided to him. The state replies that the defendant failed to prove that the state did not disclose the entire 9-1-1 tape and failed to prove prejudice from the failure of the recording device to capture the entire telephone call. The state also asserts that it disclosed the entire 9-1-1 tape as it existed. The trial court found that ["]it appears that simply the call cut off and that there was no more to that call than what is reflected on the tapes provided to the Defendant and defense counsel. At most, Ms. Sloan indicated that she might have provided additional directions on how to get to the crime scene once the call cut off. The State provided the totality of the tape that it had in its possession and the fact that the tape cuts off is not a basis to grant a new trial.["]

> We conclude the defendant has failed to establish that the state suppressed a 9-1-1 tape in its possession containing the remainder of Ms. Sloan's telephone call. The defendant has failed to establish a *Brady* violation, and he is not entitled to relief on this issue.

*Guartos*, 2006 WL 163633, at *27.

The petitioner has failed to demonstrate that the state court's adjudication of his claim involved an unreasonable application of clearly established federal law or was based upon an unreasonable determination of the facts in light of the evidence before the state court. 28 U.S.C. § 2254(d)(1). He is therefore not entitled to habeas relief on the basis of this claim.

### 16.    Claim 43:    The State's Failure to Turn Over Tape Recordings by Witnesses Hudson and Franklin

Guartos contends that he was denied due process when the State failed to turn over the tape-recorded statements of witnesses Christina Hudson and Barbara Franklin, in violation of *Brady v. Maryland*. Guartos raised this argument on direct appeal, where he also asserted that the witnesses' statements are inconsistent with their trial testimony. For example, Hudson described the robbers as wearing hats during the tape-recorded statement, but did not describe them as wearing hats at trial, and Franklin identified Guartos as having been in the jewelry store the day before the robbery, but described him as having long hair that was pulled back.

Guartos testified at the motion for a new trial that he did not hear and was not aware of the tape-

recorded statements of these two witnesses until after trial, when his post-conviction attorney procured them and provided them to Guartos, and that he was severely prejudiced by the State's failure to disclose the interviews so that the petitioner himself could hear them. Guartos's trial counsel testified at the hearing that he had the tape recordings prior to trial, but that he never played them for Guartos because of time constraints. In other words, the State did not fail to provide the recordings to the defense. Rather, defense counsel failed to provide them to his client. Based on this evidence, the Tennessee Court of Criminal Appeals rejected the petitioner's claim, noting:

> The defendant cites no authority for the proposition that due process requires the state to ensure that the defendant personally reviews all potentially exculpatory evidence that it discloses to the defense. *Brady* simply does not require the prosecution to disclose information that the accused already possesses or is able to obtain. The defendant has failed to show that the state had any hand in the defendant's failure to review the tapes. This issue is without merit.

*Guartos*, 2006 WL 163633, at *28.

In reaching its conclusion, the state court considered and relied upon relevant Supreme Court precedent—*Brady v. Maryland*. The state court's adjudication of this claim did not involve an unreasonable application of clearly established federal law, and it was not based on an unreasonable determination of the facts in light of the evidence before the state court. Guartos is not entitled to relief on the basis of this claim.

### 17.    Claim 49:  Denial of Due Process Based on Detectives' Destruction of Handwritten Notes from Interview

Guartos argues that the State violated his due process rights and the Tennessee Rules of Criminal Procedure "because all of the notes of the Police Officers of their interview with Petitioner Guartos on March 15, 2000, had been destroyed." (ECF No. 1, at 14.) Although, as with his other claims, the petitioner did not provide factual or legal support for his claim, he presumably intended to reiterate here his argument on direct appeal pertaining to Detectives Haney and Tarkington's destruction of the handwritten notes of their interview of Guartos after they had converted their notes into typed summary reports.

As an initial matter, the Court notes that the claim based on the alleged violation of the Tennessee Rules of Criminal Procedure does not plead a "violation of the Constitution or laws or treaties of the United States" and therefore fails to state a claim upon which habeas relief may be based.

In reviewing the due-process claims related to the destruction of the notes, the Tennessee Court of Criminal Appeals stated as follows:

> At the trial, Detectives Haney and Tarkington testified that they had taken notes during their interview with the defendant in Miami, Florida. At the motion for new trial, Detective Haney testified that he had not destroyed his notes of the interview until after the defendant was convicted and Detective Tarkington testified that the typewritten report accurately reflected all of the pertinent information contained within the handwritten notes. The record reflects that the defendant failed to seek production of the notes at the trial or to otherwise cross-examine the detectives regarding their existence. . . . Regarding his due process argument, we conclude the defendant has failed to show that the handwritten notes contained any exculpatory information. The defendant is not entitled to relief on this issue.

*Guartos*, 2006 WL 163633, at *31.

Because the petitioner has failed to demonstrate that the state court's adjudication of his claim involved an unreasonable application of clearly established federal law or was based upon an unreasonable determination of the facts in light of the evidence before the state court, he is not entitled to habeas relief as to this claim.

### 18.     Claim 51: Denial of Due Process Based on State's Failure to Comply with Rule 16 of Tennessee Rules of Criminal Procedure

Guartos argued in his direct appeal that his appellate counsel did not learn that Guartos had given a second statement to the police after he had been arrested and brought to Nashville. (ECF No. 33-1, at 227.) The prosecutor was not told about the statement, and it was not disclosed to defense counsel prior to trial. Guartos argued both that this second statement was "newly discovered evidence" that warranted a new trial, and that the failure to disclose the statement, which he characterized as exculpatory, amounted to a due-process violation. (ECF No. 33-1, at 228.) He raises the same argument in his habeas petition.

Detective Tarkington's report summarized the petitioner's statement as follows:

On 06-22-2000, Det. Robert Jinette of the fugitive section and myself were in Miami, Florida to pickup and extradite the defendant identified as Bryant Guartos back to Nashville for the robbery and homicide of the victim known as Roy Benton Rogers. . . .

On 06/26/2001, I checked Guartos out of jail and he was brought to the CID/Robbery Unit. Once we reached the office Guartos began by asking what he had told Det. Dean Haney and myself when we visited him in the Miami jail several months ago. At the time he stated no one could know he had confessed to being involved in the robbery/homicide for fear of his life but more importantly fear his family would be killed. He stated he hoped we had taped him then because he had nothing more to say. Threats had been made to him because someone in Miami had informed old friends he had snitched on the others about the robbery and homicide that occurred in Nashville. He stated he was

> afraid for his family and had nothing else to say. He did not ask for an attorney and was told if he wanted to talk at a later date he could call me and I would come to the jail and check him out. He was returned to the jail.

(ECF No. 33-1, at 229.)

The Tennessee Court of Criminal Appeals agreed that the State had an obligation under Rule 16 of the Tennessee Rules of Criminal Procedure to disclose the statement to the defense prior to trial, but that the statement in question was not exculpatory. Instead, it "reinforces[d] the fact that the defendant confessed to Detectives Haney and Tarkington in Miami. The defendant in his statement acknowledges his prior confession and states his concern for safety of himself and his family because of his implicating his confederates." *Guartos*, 2006 WL 163633, at *31. The court therefore concluded that Guartos "failed to show prejudice and the state's failure to disclose the statement did not affect the outcome of the proceedings." *Id.*

The petitioner has failed to demonstrate that the state court's adjudication of his claim involved an unreasonable application of clearly established federal law or an unreasonable determination of the facts in light of the evidence before the state court. He is therefore not entitled to habeas relief on the basis of this claim.

### 19. Claim 53: Alleged Brady Violation Based on State's Failure to Disclose Contents of an Interview with a Confidential Informant

Guartos next asserts that the State violated *Brady* by failing to disclose the contents of an interview with an unidentified individual, allegedly a confidential informant, whom Detectives Haney and Tarkington interviewed just prior to interviewing the petitioner in March 2000 in Miami, Florida. Guartos raised this claim on direct appeal. In rejecting the claim, the Tennessee Court of Criminal Appeals explained:

> The defendant contends he was denied exculpatory information in violation of *Brady* by the state's failure to disclose the contents of Detective Tarkington's interview with a confidential informant. He asserts that if the information in Detective Tarkington's report connects the defendant to the crime, then the information is exculpatory and should have been turned over under *Brady* because he could have used that information to impeach the detective's testimony at the trial. He claims the impeachment value is based upon the detective's statement that he did not go to Miami to interview the defendant and that therefore, he did not bring any recording equipment with him to Miami. The defendant argues that if the detectives had learned from a confidential informant that he was involved in the crime, they would have brought recording equipment with them to the interview. The state contends that the defendant failed to prove the confidential informant's statement was exculpatory in any respect.

Initially, we note that the defendant did not have an opportunity to review the information from Detective Tarkington's interview with the confidential informant because it was filed under seal. We have reviewed the interview and conclude that it does not contain "obviously exculpatory" material. The defendant claims, however, that if the report identified him as a perpetrator of the robbery, he could have used that information to cross-examine the detectives on why they failed to record their interrogation of him. We believe, though, that such questioning would not show that a reasonable probability exists that the results of his trial would have changed. The defendant is not entitled to relief on this issue.

*Guartos*, 2006 WL 163633, at *28.

Again, the state court relied on the relevant Supreme Court precedent of *Brady v. Maryland* and applied it correctly. Because petitioner has failed to demonstrate that the state court's adjudication of his claims involved an unreasonable application of clearly established federal law or was based upon an unreasonable determination of the facts in light of the evidence before the state court, he is not entitled to habeas relief on the basis of this claim.

### 20. Claim 54: Denial of Due Process Based on State's Failure to Disclose Haney's Police Report

Guartos contends that he was denied due process by the State's failure to disclose a police report created by Detective Haney, which corroborated part of the petitioner's version of events. Guartos raised this claim on direct appeal, but the Court of Criminal Appeals rejected the claim, finding as follows:

The defendant contends he was denied due process by the failure of the state to disclose Detective Haney's police report containing information that someone placed a telephone call from the Howard Johnson motel to an escort service. . . . He claims that his fingerprint on the phonebook placed him in room 204 and that Detective Haney's report would have supported the defendant's testimony that he had been in the room only to call an escort service for the occupants of the room. The defendant claims that if he had this report at the trial, it would have supported his credibility by corroborating his testimony and allowed him to cross-examine Detective Haney about the escort service. . .

. . . . The trial court found that the state "should have erred on the side of caution and provided the report to the defense." However, the trial court found the state's failure did not provide grounds for a new trial because the defendant was provided with all of the telephone records and the defendant could have brought the telephone call to his attorney's attention.

We conclude that the report was not material and that the state's failure to disclose it to the defense did not constitute a *Brady* violation. In this regard, we note that the report corroborated the defendant's statement that he called an escort service from room 204. That fact, however, is not incongruous with the defendant's culpability in the robbery. Although someone from room 204 called an escort service, we conclude that the jury could well have accepted the defendant's statement that he called the escort service from room 204 and still determined that he along with his room 204 confederates committed the robbery. The defendant has failed to demonstrate that a reasonable probability exists that the result of his trial would have changed had he been provided Detective Haney's report. The defendant is not entitled to relief on this issue.

*Guartos*, 2006 WL 163633, at *30.

In other words, the state court reasonably concluded that the information at issue was not *Brady* material. Because Guartos has failed to demonstrate that the state court's adjudication of his claims involved an unreasonable application of clearly established federal law or was based upon an unreasonable determination of the facts in light of the evidence before the state court, he is not entitled to habeas relief on the basis of this claim.

**21.     Claims 57 and 58:  Excessive Sentence in Violation of** Blakely v. Washington

Guartos raises two related excessive-sentence claims:  (1) that the trial court erred in imposing the maximum sentences in violation of *Blakely v. Washington*, 542 U.S. 296 (2004); and (2) that it erred in imposing consecutive sentences, also in violation of *Blakely*.  The question raised by these claims is whether the sentences violate clearly established federal constitutional law.

Both the *Blakely* claims presented here were raised on direct appeal.  With respect to the first claim, that the trial court erroneously imposed the maximum sentences, the petitioner was already granted relief on the basis of this claim, after a remand by the United States Supreme Court.  He has not shown that he is entitled to further relief on the basis of this claim.

The second claim fails to state a cognizable claim for relief, because the United States Supreme Court has expressly held that *Blakely* does not implicate consecutive sentencing.  *Oregon v. Ice*, 555 U.S. 160, 164 (2009) (holding that the Sixth Amendment does not inhibit states from assigning to judges, rather than to juries, the factual findings necessary to the imposition of consecutive rather than concurrent sentences for multiple offenses).  Guartos is therefore not entitled to relief on the basis of this claim.

**VI.     CONCLUSION**

The Court finds that none of the claims raised in Guartos's petition entitles the petitioner to relief. The petition will therefore be denied and this matter dismissed.

The Court must issue or deny a certificate of appealability ("COA") when it enters a final order adverse to a § 2254 petitioner.  Rule 11, Rules Gov'g § 2254 Cases.  The petitioner may not take an appeal unless a district or circuit judge issues a COA.  28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1). A COA may issue only if the petitioner "has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the COA must "indicate which specific issue or issues satisfy the

[required] showing . . . ."  28 U.S.C. § 2253(c)(3).  A "substantial showing" is made when the petitioner demonstrates that "'reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were "adequate to deserve encouragement to proceed further."'"  *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).  "[A] COA does not require a showing that the appeal will succeed."  *Miller-El*, 537 U.S. at 337.  Courts should not issue a COA as a matter of course.  *Id.*

In this case, although this Court would not necessarily have reached the same decisions as the state courts in every respect, the petition presented here fails to state any viable basis for federal habeas relief.  Because an appeal by the petitioner on any of the issues raised in this petition would not deserve attention, the Court will deny a COA.

Further, Rule 24(a)(3) of the Federal Rule of Appellate Procedure provides that a party who was permitted to proceed *in forma pauperis* in the district court may proceed on appeal *in forma pauperis* unless the district court certifies that an appeal would not be taken in good faith or otherwise denies leave to appeal *in forma pauperis*.  For the same reasons the Court will deny a certificate of appealability, the Court will certify that any appeal would not be taken in good faith.

An appropriate order will enter.

Kevin H. Sharp
United States District Judge